Hillsborough
No. 84-165

FRANK L. IVES

v.

MANCHESTER SUBARU, INC. & a.

July 26, 1985

*Wendell, Clark & Solomon*, of Manchester (*Grenville Clark, III*, on the brief and orally), for the plaintiff.

*Myers & Laufer*, of Concord (*Peter J. Duffy* on the brief and orally), for the defendants.

SOUTER, J. The plaintiff brought action against the defendant corporation for unpaid wages owed to him under contracts to employ him, successively, as sales manager and general manager. He further claimed liquidated damages and attorney's fees under the wage claim statute, RSA 275:44, IV and :53, III, and he sought to hold the president of the corporation individually liable under RSA 275:42, V.

A Master (*Peter J. Bourque*, Esq.) recommended an award of $23,808 for wages due to the plaintiff as general manager, but recommended dismissal of the claim for wages as sales manager and the claims for liquidated damages, attorney's fees and individual liability of the corporation's president. After the Superior Court (*Goode*, J.) approved the master's report, the plaintiff appealed from the dismissal of the claims for liquidated damages, attorney's fees and individual liability in connection with his contract as general manager, and the defendant cross-appealed. We sustain the award of damages but reverse the dismissal of the claims for liquidated damages, attorney's fees and individual liability.

At all relevant times, the defendant Marvin Spiegel was president and majority stockholder of the defendant corporation, Manchester Subaru, Inc. In March of 1980 he employed the plaintiff as the corporation's sales manager for 12% of the quarterly pre-tax profit from sales, with a guaranteed draw against this amount of $500 a week. The corporation withheld federal taxes from both the draw and the net quarterly payments.

On March 15, 1981, Mr. Spiegel made an oral agreement to employ the plaintiff as general manager of the corporation for 15% of the agency's "bottom line," i.e. its annual pre-tax profit, with a guaranteed draw of $700 a week. At trial, the parties gave inconsistent versions of the terms of this agreement so far as it governed the calculation of the pre-tax profit figure. The plaintiff maintained that they had agreed that the figure would be calculated on the basis of internal bookkeeping statements, as adjusted by adding back any draw paid to Mr. Spiegel above $800 a week, the costs of defending two lawsuits, and any increases in the cost of inventory financing above the cost for the prior fiscal year. Mr. Spiegel testified that the figure was to be the amount shown on the year-end statement prepared by independent accountants plus an add-back of his draw in excess of $800 a week. He denied that they had agreed to add back legal expenses or any financing costs.

During the time that the plaintiff served as general manager he received only his weekly draw, subject to withholding of FICA and federal income taxes. On January 7, 1982, Mr. Spiegal fired him. When Mr. Spiegel asked the bookkeeper to calculate what the corporation owed the plaintiff, the bookkeeper determined that it owed him $1,232 under his earlier contract as sales manager and $20,103 under his later contract as general manager, all of it relating to the fiscal year that ended on November 30, 1981. There was testimony that Mr. Spiegel expressed dissatisfaction with these figures. In fact, the corporation paid the plaintiff nothing further, and on March 1, 1982, the plaintiff brought this action.

On March 26, 1982, the corporation received its fiscal year-end statement from outside accountants, showing a pre-tax "net income" that was $160,353 lower than the corporate bookkeeper's pre-tax "net profit." Of that difference, $150,000 represented a "bonus" paid to Mr. Spiegel after the close of the fiscal year but before the outside accountants had prepared their statement. Mr. Spiegel testified that his "bonus" could have been even larger if he had so chosen. "I could have cleaned out the corporation if I elected to do so."

The record indicates that Mr. Spiegel adjusted the accountants' "net income" figure by adding back $2,200 of his weekly $3,000 draw for the 37 weeks in question, but without adding back his

"bonus." He testified that after making this adjustment the plaintiff's draw at $700 a week totalled more than 15% of pre-tax profit, and he gave this as the reason that the corporation paid the plaintiff nothing further. Mr. Spiegel repeatedly testified that he had paid the plaintiff nothing more before March 26 because the outside accountants' statement was not ready, and had paid the plaintiff nothing after that date because nothing was due.

After a two-day trial, the master accepted the plaintiff's version of the agreement, and calculated that the corporation owed him $23,808 as general manager, attributable to the prior fiscal year. The master did not, however, recommend further relief under RSA chapter 275, stating:

> "The basis for this finding is the fact that the evidence indicates an honest difference of opinion between the parties as to precisely what amount in fact was due and owing the plaintiff. Further, that what the plaintiff is seeking are funds due and owing him from a profit-sharing agreement. He was well aware that he would not be paid the sums due him on a periodic basis but rather that they would be paid in one lump sum after an audit."

██ We will begin our consideration of the case by taking up the two issues that the defendant corporation raises on its cross-appeal, for they are most readily disposed of. The defendant first argues that the oral contract is unenforceable under the Statute of Frauds, so that the plaintiff's only possibility of recovery is on a claim of quantum meruit. *See* RSA 506:2. This argument mistakes the scope of the Statute of Frauds. While an oral contract "not to be performed within one year from the time of making it," is unenforceable under the statute, *id.*, it is settled law that a contract for personal services does not fall within the statute if performance could be completed within one year without breach by either party. *Cox v. Pinkham*, 80 N.H. 134, 135, 114 A. 18, 19 (1921); *Martin v. Batchelder*, 69 N.H. 360, 361, 41 A. 83, 84 (1898). Thus, the possibility of death of a party or legitimate termination, as here, removes the contract from the statute's requirements.

██ The defendant's second argument is that there was no enforceable contract, for lack of mutual assent to essential terms. The defendant rests this position on the master's finding that there was "an honest difference of opinion between the parties as to precisely what amount in fact was due and owing the plaintiff." This finding does not, however, indicate that there was no contract; it indicates only what it says, that there was a dispute about the precise amount owed under the contract.

Thus, we conclude that the defendant has demonstrated no error undermining the verdict as far as it went, and we turn to the plaintiff's exceptions to the court's refusal to award further relief under the wage claim statute. The first issue raised is whether the agreement to pay the plaintiff a share of profits was an agreement to pay "wages" within the meaning of RSA 275:42, III.

That statute defines wages as "compensation . . . for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation." *Id.* It is obvious that the parties' agreement for a share of profits was intended to provide compensation for the plaintiff's labor and services, and it clearly may fall within the statute's reference to compensation calculated on some "other basis." Standing alone these are sufficient reasons to conclude that the plaintiff's share of profits was a wage under the statute, and we so hold. This result is comparable to the holding of the California Court of Appeal applying a similar definition of "wages" in *Ware v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 24 Cal. App. 3d 35, 44, 100 Cal. Rptr. 791, 798 (1972), *aff'd*, 414 U.S. 117 (1973):

> "The profit sharing plan is clearly an inducement to employees by a plan through which they benefit financially in proportion to their compensation. Consequently, defendant's contributions to the plan should be considered wages within the meaning of [the] Labor Code."

*See also* 26 C.F.R. § 31.3401(a)-1(a)(3) (1984) (an employee is paid remuneration subject to federal income tax withholding when paid on the basis of a percentage of profits).

Arguments to the contrary are not persuasive. The plaintiff had no interest in the business entitling him to anything except compensation. He owned no stock. He had no right to manage the business independently of Mr. Spiegel, and no liability for any losses, that could suggest that he had a partnership interest. *See* RSA 304-A:7, IV, :18, I and :18, V; *Atherton v. Tilton*, 44 N.H. 452, 456–57 (1863); *Newman v. Bean*, 21 N.H. 93, 99 (1850). Thus there is no basis to conclude that he was anything but an employee or that the money paid to him was anything but compensation for labor and services.

Nor is our conclusion inconsistent with the fact that the agreement did not provide a stated date or certain time for payment of the share if the share exceeded the draw. Although RSA 275:43, I (Supp. 1983) requires generally that wages be paid within eight days after the end of the week in which they are earned, paragraph II empowers the labor commissioner to approve plans for the payment of wages at less frequent intervals, provided that some wages

are paid at least monthly. We should add that an employer who obeys the statute by obtaining the labor commissioner's approval for an unusual wage contract can obtain advance approval of the time and method for calculating wages under the contract. He can thus determine in advance exactly how the requirements of the wage claim statute will be applied to his contractual obligations.

We therefore hold that the master erred in ruling that the share of profits did not constitute wages under RSA 275:42, III, and we turn to consider what remedies the plaintiff was entitled to claim under the statute. We deal first with the provisions of RSA 275:44, IV, that an employer who "willfully and without good cause" fails to pay wages within 72 hours of discharging an employee shall pay liquidated damages in addition to the wages, to be calculated at 10% for each business day during which failure persists, but limited to the amount of the wages thus withheld. We note initially that there can of course be no liability under this statute until such time as wages can be calculated as due. In this case the only wages in question were earned in the fiscal year that ended more than a month before the plaintiff was fired, and the bookkeeper's records allowed for prompt calculation. Since wages due were thus capable of calculation and actually calculated, we consider whether the corporate defendant willfully and without good cause withheld them.

A willful act is a voluntary act committed with an intent to cause its results. BLACK'S LAW DICTIONARY 1434 (rev. 5th ed. 1979). It is not, by contrast, an accident or an act committed on the basis of a mistake of fact. *See Hynes v. Whitehouse*, 120 N.H. 417, 420, 415 A.2d 876, 877 (1980). Thus, "[a]n employer acts wilfully if, having the financial ability to pay wages which he knows he owes, fails to pay them. The statute was not intended to impose liability where the employer's refusal to pay wages is based upon bona fide belief that he is not obligated to pay them." *Hekker v. Sabre Construction Co.*, 265 Or. 552, 561, 510 P.2d 347, 351 (1973) (quoting *State ex rel. Nilsen v. Lee*, 251 Or. 284, 293, 444 P.2d 548, 553 (1968)). Therefore, in the present context we take "willfully" to mean voluntarily, with knowledge of the obligation and despite the financial ability to pay it.

The term "without good cause," as describing a further condition that must be met before liquidated damages may be awarded, is not so readily understood. No prior New Hampshire cases construing the phrase are directly on point, although it has been held that "'[n]o nearer and no closer definition can be given than that there will be good cause whenever it is fair and just as between the

parties that it should be so.'" *Jaques v. Chandler*, 73 N.H. 376, 381, 62 A. 713, 714 (1905) (quoting *Forster v. Farquhar*, [1893] 1 Q.B. 564, 567). The difficulty with a broad "fair and just" standard in this context, however, is that it is difficult to imagine a case in which it would be fair and just for an employer to withhold wages at the same time that he acts willfully, as we have construed that term above. Therefore, despite the general rule that the legislature is not presumed to waste words, *Appeal of Public Serv. Co. of N.H.*, 125 N.H. 46, 54, 480 A.2d 20, 25 (1984), we are unable to construe "without good cause" as setting up a further condition that must be proven to justify liquidated damages. Accordingly we construe "willfully and without good cause" as a single phrase meaning voluntarily, with knowledge that the wages are owed and despite financial ability to pay them.

Having so construed the statute, we cannot be certain of its applicability on the present state of the record. The defendants note a number of findings in support of their argument that the master found no failure to pay that was willful and without good cause, but in each instance it is not at all clear that the finding is as broad as the defendants would read it.

For example, the master granted a finding requested by the defendants, that Mr. Spiegel did not willfully withhold wages. But we cannot tell whether the master granted the request because there was no willful act or because he believed the sums withheld were not "wages." Similarly, the master denied the plaintiff's request to find that Mr. Speigel knew in early January that the corporation owed the plaintiff approximately $21,000. But we cannot tell whether the master denied the request because the evidence showed that some of the asserted $21,000 represented compensation that had actually been paid under the plaintiff's earlier contract to act as sales manager, or for some other reason. While the master found that there was a genuine dispute as to the amount due, we do not read this to mean that there was such a dispute as to the entire amount due. As a final example, the defendants point out that the master found that the plaintiff was aware that he would be paid after an audit. But it is not clear how this squares with another finding, that the parties agreed that the plaintiff's share would be calculated using the monthly internal bookkeeping records.

Suffice it to say that the master had found that none of the money was "wages," and therefore he was not concerned with the question of liquidated damages. We believe that it would be speculative for us to try to settle the issue of liquidated damages on this record. We can only note that there was evidence from which it could be found

that the corporation acting through Mr. Spiegel had acted willfully and without good cause, and we will therefore remand the case for fresh findings of fact and rulings of law in the light of our holding that the disputed sum is wages within the meaning of the statute. The master may, of course, take further testimony in his discretion.

We turn next to the plaintiff's claim that Mr. Spiegel should be subject to personal liability for payment of the entire judgment, under the provisions of RSA 275:42, V: "[f]or the purposes of [the wage claim statute] the officers of a corporation and any agents having the management of such corporation who knowingly permit the corporation to violate . . . RSA 275:43, 44 shall be deemed to be the employers of the employees of the corporation." Since it is indisputable that Mr. Spiegel was both an officer and an agent having the management of the corporate defendant, the issue of his personal liability therefore turns on whether he knowingly permitted the violation of the statutes requiring systematic payment of wages, RSA 275:43, II, and payment of wages within 72 hours of discharge. RSA 275:44, I.

We have held in a similar context that the requirement of knowing action requires proof of a voluntary act proceeding neither from mistake nor inadvertence. *Appeal of Metropolitan Prop. & Liabil. Ins. Co.*, 120 N.H. 733, 736, 422 A.2d 1037, 1039 (1980). On comparing this definition with the definition of willful action discussed above, it is clear that proof of willful action without good cause under the present statute necessarily includes proof of knowing action, although proof of knowing action does not require proof of intent to cause the act's result. It follows, then, that if and to the extent that the master finds that the corporation acting through Mr. Spiegel acted willfully and without good cause in violation of RSA 275:44, I, he must also find that Mr. Spiegel knowingly permitted the violation so as to subject him to personal liability under RSA 275:42, V.

The remaining issue is the plaintiff's claim for counsel fees under RSA 275:53, III, which provides that "[t]he court in any action brought under this subsection may, in addition to any judgment awarded to the plaintiff . . . allow costs of the action, and reasonable attorney's fees." "[T]his subsection" refers to § 53, and thus covers claims both for unpaid wages and for liquidated damages. Because the trial court held that the amount in dispute was not "wages" and that RSA chapter 275 did not apply, it awarded no attorney's fees. Because we hold that this is a wage claim and the statute does apply, the trial court on remand must take up the request for counsel fees. Since the parties have briefed and argued the standards

that should govern the court's consideration of a request for fees under the statute, we will address that issue in anticipation of the remand.

In the past we have rested on the discretionary language of the statute, that the court "may" award fees, and have declined to disturb a refusal of fees in the absence of a record indicating abuse of discretion. *Ransmeier v. Time Share Corp.*, 115 N.H. 300, 301, 338 A.2d 550, 551 (1975). We believe, however, that the time has come to take a step beyond *Ransmeier*, to provide a more definite standard.

■■ In so doing we are guided by the fact that the statutory chapter in question is entitled "Protective Legislation," so that we are obligated to construe it to give effect to the legislature's remedial purpose. *Caswell v. BCI Geonetics, Inc.*, 121 N.H. 1048, 1049, 437 A.2d 321, 322 (1981). Bearing this in mind, we recognize that the size of many wage claims is so small that the practical value of a plaintiff's verdict is often decidedly modest after counsel's fee has been deducted from the recovery. *See Leavitt v. Hamelin*, 126 N.H. 670, 495 A.2d 1286 (1985). Accordingly, we hold that when the court has found a wage claim meritorious, it should exercise its statutory discretion by awarding reasonable counsel fees, unless the court further finds particular facts that would render such an award inequitable.

The object of this holding is not punishment of the defendant but the practical vindication of the plaintiff's statutory rights.

> "Otherwise, impecunious plaintiffs might not avail themselves of the relief afforded. . . . The prospect of such additional cost following the event will [we] hope, [as] in England, serve as an inducement to parties litigant to reach resolution of their differences on a more amicable basis."

*Pedreyra v. Cornell Prescription Pharmacies*, 465 F. Supp. 936, 952 (D. Colo. 1979).

While in all candor it is difficult to envision circumstances in which equity would call for the denial of fees, we leave that possibility for consideration in later cases, if the issue should arise. Certainly the circumstances of the present case suggest no justification for refusing to award fees, although that is a matter for the trial court's consideration on remand.

*Affirmed as to award of damages; reversed as to verdict in favor of individual defendant and denial of liquidated damages and counsel fees; remanded for consideration of claims for liquidated damages, individual liability and counsel fees.*

All concurred.