Katherine M. CHAMBERLIN, Plaintiff, Appellee,

v.

101 REALTY, INC., et al., Defendants, Appellants.

No. 89–1876.

United States Court of Appeals, First Circuit.

Heard April 4, 1990.

Decided Oct. 3, 1990.

Rehearing and Rehearing En Banc Denied Nov. 1, 1990.

Kevin G. Powers, Boston, Mass., with whom Jack S. White, Welts & White, Nashua, N.H. and Richard J. Shea, Boston, Mass. were on brief, for defendants, appellants.

Gary B. Richardson with whom Bridget C. Ferns and Upton, Sanders, & Smith, Concord, N.H. were on brief, for plaintiff, appellee.

Before TORRUELLA, SELYA and CYR, Circuit Judges.

CYR, Circuit Judge.

Katherine Chamberlin embarked on her career as an architectural designer in February, 1983, when she accepted an offer from defendant 101 Realty, a New Hampshire building and development firm. Before fall came to New England, however, Chamberlin was terminated from her employment by defendant Matthew Zsofka, president of 101 Realty, which prompted the commencement of the present Title VII action, with pendent state law claims. After a four-day bench trial, the United States District Court for the District of New Hampshire found for Chamberlin under Title VII and on her wrongful discharge claim under New Hampshire law. The court found for defendants on the state law claim for intentional infliction of emotional distress.[1]

## I BACKGROUND

After graduation from the University of Idaho in 1979 with a bachelor's degree in architecture, Chamberlin moved to New Hampshire. Before beginning work with 101 Realty, she was employed from July 1981 to July 1982 by the Governor's Council on Energy. For the next eight months Chamberlin worked as a self-employed architectural consultant. She married Thomas Chamberlin on March 21, 1981. Defendant Zsofka, who was also married, hired her in February 1983, anticipating that she would one day supervise the custom homes division at 101 Realty.

At first Zsofka seemed to be pleased with Chamberlin's work; in his words, "[s]he did a fabulous job on all the promotional work." Even though she had no architectural design experience, which Zsofka knew before hiring her, Chamberlin demonstrated enthusiasm for her work and volunteered for various projects. She considered her new job a once in a lifetime opportunity to apply her solar energy expertise on a large scale.

The district court found that defendant Matthew Zsofka made sexual advances to Chamberlin on five occasions during the course of Chamberlin's employment. We examine these five incidents with a view to determining whether the court's findings are clearly erroneous.[2] *See Anderson v.*

---

1. Chamberlin does not appeal the dismissal of her state law claim for intentional infliction of emotional distress.

2. The district court supportably rejected Chamberlin's contentions concerning two other alleged sexual advances.

First, Zsofka instructed Chamberlin to come to his home on a Saturday morning to discuss some plans and to meet with customers. Upon her arrival, Zsofka offered Chamberlin a cup of coffee, which she refused. The district court found "[n]o suggestion of sexual intimacy [and] ... plaintiff's perception of the incident as comprising sexual harassment to be lacking in evidentiary support."

Second, Zsofka asked Chamberlin to accompany him and Donald Caron, the company comptroller, on a flight to Cape Cod for lunch and a walk on the beach. Chamberlin testified that when she refused, Zsofka ordered her to schedule time for the trip. Caron, on the other

*City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

(i) While Chamberlin was riding with Zsofka in his Chevrolet Blazer truck during the second week of May 1983, Zsofka told Chamberlin, with a "little half smile and very lustily," that she had a "good body." He added, "If you worked out, you'd have a great body." Chamberlin felt very uncomfortable, made no response, and changed the subject of conversation.[3]

(ii) Two weeks later, while visiting a construction site, Zsofka "stepped up real close to me, like within a foot, almost to where we were touching shoulders, and he looked at me, started at my head and he looked all the way down to my toes and back up again, and then he said, almost in a whisper, he said, 'You look good in tight jeans. It shows off your butt.'" Chamberlin "turned around and walked away to the other side of the building. [She] just had to get away."

(iii) On a later visit to another construction site, Zsofka said, "You look good in tight jeans." Chamberlin pretended that she did not hear the comment, hoping that he would stop.

(iv) While having lunch at a local restaurant, Zsofka took Chamberlin's hands, looked at her and said, "I like my women with good looks and brains." Chamberlin immediately removed her hands, and after a brief silence, began to discuss business matters.

(v) At another luncheon occasion, while Zsofka was discussing a recent trip to Hungary, he described how men treated women there. Chamberlin expressed distaste for the treatment Zsofka described. Zsofka then took Chamberlin's hand and said, "My women are special. I like to put them on a pedestal." Chamberlin removed her hand, sat back in her chair, and changed the subject.

The foregoing instances of sexually-motivated conduct by Zsofka occurred during a four or five week period, between mid-May and mid-June, 1983. The district court found that these five incidents occurred as Chamberlin related and that each was sexually motivated.

The district court further found that during July "Zsofka began to find fault with plaintiff's work." Zsofka's complaints related to three projects.

> He complained that the Enrights had chosen a more expensive brick walkway than called for, that plaintiff had improperly allowed them to install oak rather than pine railings without a proper change order and that plaintiff had not corrected the staircase design.[4]

> With respect to the Duschatkos, they had ordered custom cabinets. The manufacturer had advised Realty by telephone that the cabinets would be delivered a week earlier than scheduled. Afraid that the manufacturer would not keep this commitment, Zsofka directed plaintiff not to advise the Duschatkos of this communication. She did so, in direct contravention of his instructions.[5]

> The office/warehouse of Realty, construction of which plaintiff was supervi-

---

hand, *testified that he had been learning to fly,* that that was the purpose of the flight, and that such invitations were common. The district court found "the version of the incident as described by Caron to be the more credible."

**3.** At trial, Chamberlin testified as follows:

> Q. And you understood that he was talking about if you exercise, you'd have a better body. You understood that?
> A. No, I understood what his intention to me was, that he liked my body.

**4.** *The district court's footnote states:*

> The Enright contract, Plaintiff's Exhibit 12, gave to the Enrights their choice of walkway. Their inside floors were of oak, and they

therefore *asked for oak railings. The price was admittedly more expensive than pine railings, and a change order should have been prepared for this work. Plaintiff was not responsible for any correction of the staircase, as it had been designed by the outside architect.*

**5.** The district court's footnote states:

> Plaintiff testified that she had received a telephone call from the Duschatkos, who made direct inquiry as to the estimated time of delivery of the cabinets. Feeling that she could not lie to a client, she advised them of the manufacturer's estimate. However, she failed to advise Zsofka that this communication had occurred, and in fact the cabinets were not delivered a week early as promised.

sor, was to have a steel roof, the original pitch of which was unsatisfactory to Zsofka. At a meeting one week before erection of the roof, Zsofka told plaintiff that a different pitch would be required and instructed plaintiff to so advise the roof erector. Plaintiff failed to communicate with the erector.[6]

Before leaving for a vacation in August 1983, Zsofka gave Chamberlin what the district court considered a "substantial work load" and directed the comptroller to keep track of Chamberlin's hours. Chamberlin failed to complete the assigned work by the time Zsofka returned, though she worked long hours in a good faith effort to do so. On September 1, 1983, soon after he returned from vacation, Zsofka fired Chamberlin. Chamberlin testified that Zsofka's stated reason for firing her was that she "wasn't getting anything done, that [she] never accomplished any tasks and that [she] didn't have any dedication to the job." At trial, Zsofka testified as follows:

> During the process of employment it became very obvious that Mrs. Chamberlin did not have the experience to do the job that I had put her into. It also became very evident that attempts on my part to guide her or to correct her were taken very badly. Everything went great until she was criticized. Mrs. Chamberlin could not accept criticism. She could not follow training. She had felt that she knew more than anybody else around and when somebody is that intelligent there's nothing you can teach them. She started to ignore direct orders. She started to countermand orders. She started to make herself look good at our expense with customers by doing things without charging for them. It became very obvious to me towards the end that she had lost all interest in her job. She became totally useless to us. I could not trust her to even follow out my orders.

I could see of absolutely no possible reason to keep her employed.

## II  DISCUSSION

We review the district court's findings of fact under a "clearly erroneous" standard. Fed.R.Civ.P. 52(a). *Anderson*, 470 U.S. at 573, 105 S.Ct. at 1511 ("a finding of intentional discrimination is a finding of fact"); *Hall v. Gus Const. Co., Inc.*, 842 F.2d 1010, 1013 (8th Cir.1988) ("clearly erroneous" standard used where trial court made finding that female traffic controllers at road construction site were subjected to sexual harassment). We reverse only if we are " 'left with the definite and firm conviction that a mistake has been committed.' " *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). We are not left with a firm conviction that the district court erred.

*Title VII Claims*

Under Title VII it is "an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a)(1). The EEOC interprets Title VII as proscribing sexual harassment. *See* 29 C.F.R. § 1604.11(a) (1983) (EEOC guidelines) ("Harassment on the basis of sex is a violation ... of Title VII."); *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65–66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). The *Meritor* Court states that:

> As an 'administrative interpretation of the Act by the enforcing agency,' *Griggs v. Duke Power Co.*, 401 U.S. 424, 433–434 [91 S.Ct. 849, 854–55, 28 L.Ed.2d 158] (1971), the[ ] [EEOC] Guidelines ... 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance,' *General Electric Co. v. Gilbert*,

---

**6.** The district court's footnote states:

Plaintiff testified that she had communicated Zsofka's desire to the roof erector, but he refused to comply. She therefore told Zsofka that the erector knew more than Zsofka did. Michael Raymond, the roof erector, called in rebuttal by plaintiff, testified that she had never communicated with him the wish to change roof pitch and that, had she done so, and had he been given a written change order, he would have complied and changed the roof pitch.

429 U.S. 125, 141–142 [97 S.Ct. 401, 411, 50 L.Ed.2d 343] (1976), quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 [65 S.Ct. 161, 164, 89 L.Ed. 124] (1944). *Id.* 477 U.S. at 65, 106 S.Ct. at 2404. *Accord Morgan v. Massachusetts Gen. Hosp.*, 901 F.2d 186, 192 (1st Cir.1990).

The EEOC guidelines articulate two types of sexual harassment. "Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment" [or] "submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual ['quid pro quo' harassment], or [ (2) ] "such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment ['hostile environment' harassment]." 29 C.F.R. § 1604.11(a) (1983).

■■■ Chamberlin established a *prima facie* case under Title VII by presenting direct evidence that unlawful sexual discrimination was a motivating factor in Zsofka's decision to terminate her employment. There is no need, therefore, to undertake the *McDonnell Douglas* analysis in the present case.[7] Rather, once Chamberlin presented a *prima facie* case, the burden of persuasion, as well as the burden of production, passed to the defendants to show "by a preponderance of the evidence that the same decision would have been made absent the discrimination." *Lipsett*, 864 F.2d at 899 (quoting *Fields v. Clark University*, 817 F.2d 931, 937 (1st Cir. 1987)). Of course, "the burden of persuasion on the ultimate issue of intent remains with the plaintiff at all times." *Petitti v. New England Tel. & Tel. Co.*, 909 F.2d 28, 31 (1st Cir.1990) (quoting *Lipsett*, 864 F.2d at 899).

■■■ Sexual harassment under Title VII may be actionable as *"quid pro quo* harassment" and as "hostile environment" discrimination. *See Henson v. City of Dundee*, 682 F.2d 897, 908 n. 18 (11th Cir. 1982) (sexual harassment claims often "characterized interchangeably as condition of work [hostile environment] or *quid pro quo* cases"). For example, a particular workplace may be so infused with severe sexual discrimination as to give rise to a viable "hostile environment" claim, yet there is no reason that a discharge from employment occurring in such an environment could not constitute *quid pro quo* harassment as well. *See Carrero v. New York City Housing Authority*, 890 F.2d 569, 579 (2d Cir.1989) ("Hostile environment and *quid pro quo* harassment causes of action are not always clearly distinct and separate. The discrimination which gives rise to them is not neatly compartmentalized but . . . the two types of claims may be complementary to one other.").

■■■ Chamberlin predicates her hostile environment and *quid pro quo* harassment claims on the same five incidents of sexually-motivated conduct. In doing so, however, Chamberlin impermissibly blurs her

7. Where there is direct evidence of discriminatory intent, the framework prescribed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), is inapplicable. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination.") (ADEA case). *See also Lipsett v. University of Puerto Rico*, 864 F.2d 881, 899 (1st Cir.1988) (applying Title VII substantive requirements in case arising under Title IX). "The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the 'plaintiff [has her] day in court despite the unavailability of direct evidence.'" *Thurston*, 469 U.S. at 121, 105 S.Ct. at 621 (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir.1979)). The initial burden is not "onerous and, if met, shifts the burden of production to the defendant, who must then articulate a legitimate, nondiscriminatory reason for discharging the plaintiff." *Lipsett*, 864 F.2d at 899 (citations omitted). The plaintiff then must be given an opportunity to demonstrate that the stated reasons were not the real ones, but were merely pretextual. *See, e.g., Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1983); *Petitti v. New England Tel. & Tel. Co.*, 909 F.2d 28, 31 (1st Cir.1990).

*quid pro quo* and hostile environment claims by urging that she has satisfied one of the essential elements of her hostile environment discrimination claim solely on the strength of the contention that her firing *"establishes* how pervasive and abusive the harassment had become." (emphasis added). We recognize, of course, that a sexually-motivated discharge from employment may evidence a discriminatory workplace environment, provided the two are causally connected. Nonetheless, we cannot accept a universal thesis that the "severity or pervasiveness" element essential to an actionable hostile environment discrimination claim is met merely with evidence sufficient to establish *quid pro quo* harassment. For example, although a supervisor's demand that an employee submit to an unwelcome sexual advance or face discharge from employment could well constitute a sustainable *quid pro quo* harassment claim, an isolated sexual advance, without more, does not satisfy the requirement that an employee asserting a cause of action for hostile environment discrimination demonstrate an abusive workplace environment. *See Meritor Savings Bank,* 477 U.S. at 67, 106 S.Ct. at 2405 (hostile environment claim not actionable unless harassment "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' ") (quoting *Henson,* 682 F.2d at 904); *accord Morgan,* 901 F.2d at 192.

▄▄ The district court concluded that Chamberlin had established an actionable hostile environment claim but made no finding that Zsofka's sexual advances were sufficiently severe or pervasive that the workplace was rendered abusive. The district court did conclude, however, that "but for [Chamberlin's] failure to respond [to Zsofka's sexual advances], her employment with Realty would not have terminated." Although probative even under a hostile environment claim analysis, in the present

case the latter finding alone did not satisfy the requirement that the alleged sexual discrimination be found sufficiently severe or pervasive to render the workplace environment abusive. We consider it highly doubtful, in fact, that the sexual advances made to Chamberlin in these circumstances, without more, could be considered sufficiently "severe or pervasive" to support a sexual discrimination claim of the hostile environment variety, without blurring beyond recognition any meaningful distinction between hostile environment and *quid pro quo* discrimination.

▄▄ On the other hand, the district court made all the requisite findings for an actionable *quid pro quo* sexual harassment claim.[8] *Quid pro quo* harassment obtains "when a supervisor conditions the granting of an economic or other job benefit upon the receipt of sexual favors from a subordinate, *or* punishes that subordinate for refusing to comply." *Lipsett,* 864 F.2d at 897 (emphasis added). It is the essence of *quid pro quo* harassment that the employee "was subject[ed] to unwelcome sexual advances by a supervisor ... and ... her reaction to these advances affected tangible aspects of ... her compensation, terms, conditions, or privileges of employment...." *Id.* at 898. "In rebuttal, the defendant may show that the behavior complained of either did not take place or that it did not affect a tangible aspect of the plaintiff's employment...." *Id.*

▄▄ Chamberlin's *quid pro quo* harassment claim must meet a five-part test: whether (1) the plaintiff-employee is a member of a protected group; (2) the sexual advances were unwelcome; (3) the harassment was sexually motivated; (4) the employee's reaction to the supervisor's advances affected a tangible aspect of her employment; and (5) *respondeat superior* liability has been established. *See, e.g.,*

---

**8.** "We are, of course, free to affirm a district court's decision 'on any ground supported by the record even if the issue was not pleaded, tried or otherwise referred to in the proceedings below.' " *Norris v. Lumbermen's Mutual Casualty Co.,* 881 F.2d 1144, 1151–52 (1st Cir.1989)

(quoting *Doe v. Anrig,* 728 F.2d 30, 32 (1st Cir. 1984) quoting *Brown v. St. Louis Police Department,* 691 F.2d 393, 396 (8th Cir.1982), *cert. denied,* 461 U.S. 908, 103 S.Ct. 1882, 76 L.Ed.2d 812 (1983), (collecting cases)).

*Henson,* 682 F.2d 897; *Jones v. Flagship Int'l.,* 793 F.2d 714 (5th Cir.1986).

First, we examine whether Chamberlin is a member of a protected group: as she is female, a simple gender stipulation met the first test.

The second requirement—the unwelcomeness of the sexual advances—necessitates a finding that the advances were uninvited and offensive or unwanted from the standpoint of the employee.[9] Where, as in the present case, the employee never verbally rejects the supervisor's sexual advances, yet there is no contention or evidence that the employee ever invited them, evidence that the employee consistently demonstrated her unalterable resistance to all sexual advances is enough to establish their unwelcomeness. *See Lipsett,* 864 F.2d at 898 ("woman's consistent failure to respond to suggestive comments or gestures may be sufficient to communicate that the man's conduct is unwelcome").

Chamberlin consistently communicated the unwelcomeness of Zsofka's sexual advances by more overt means as well. For instance, on the two occasions that Zsofka took Chamberlin's hands into his and stated, "I like my women with good looks and brains" and "I like to put them on a pedestal," Chamberlin immediately withdrew her hands and changed the subject of conversation. After Zsofka remarked that tight jeans highlighted Chamberlin's buttocks, she immediately left his presence.

Furthermore, the perspective of the factfinder evaluating the welcomeness of sexual overtures in these circumstances must take account of the fact that the employee may reasonably perceive that her recourse to more emphatic means of communicating the unwelcomeness of the supervisor's sexual advances, as by registering a complaint, though normally advisable, may prompt the termination of her employment, especially when the sexual overtures are made by the owner of the firm. Thus,

Chamberlin was confronted with an employment dilemma not unlike that in *Meritor,* where sexual advances were made by the employee's supervisor and company procedure mandated that employees bring their grievances to the attention of a supervisor. *Meritor,* 477 U.S. at 73, 106 S.Ct. at 2408. There the Court considered "it ... not altogether surprising that respondent failed to invoke the procedure and report her grievance to him," *id.;* nor do we.

The third element in an actionable *quid pro quo* claim is that the harassment be sex based; in other words, it must appear that, "but for the fact of her sex, the plaintiff would not have been the object of harassment," *Jones,* 793 F.2d at 719; *Henson,* 682 F.2d at 904 ("In the typical case in which a male supervisor makes sexual overtures to a female worker, it is obvious that the supervisor did not treat male employees in a similar fashion. It will therefore be a simple matter for the plaintiff to prove that but for her sex, she would not have been subjected to sexual harassment."). There being no indication that Zsofka treated male employees in the manner he treated Chamberlin, there can be no question that, but for the fact that Chamberlin is female, she would not have been subjected to sexual harassment.

The fourth requirement of a viable *quid pro quo* harassment claim is that "[t]he acceptance or rejection of the harassment by an employee must be an express or implied condition to the receipt of a job benefit or the cause of a tangible job detriment...." *Id.* at 909; *see Jones,* 793 F.2d at 722. As stated in *Lipsett,* 864 F.2d at 898, Chamberlin must show that "her reaction to these advances affected tangible aspects of ... her compensation, terms, conditions, or privileges of employment...."

We believe that the district court correctly ruled that, "but for [Chamberlin's] fail-

---

9. *The perspective of the factfinder weighing the welcomeness of sexual advances is "particularly important ... [where the defendant contends that] the plaintiff misconstrued or overreacted to what the defendant claims were innocent or invited overtures." Lipsett,* 864 F.2d at 898.

The "welcomeness" inquiry must be undertaken with the recognition that "[t]he man must be sensitive to signals from the woman that his comments are unwelcome, and the woman, conversely, must take responsibility for making those signals clear." *Id.*

ure to respond, her employment with Realty would not have been terminated." Although Chamberlin's inexperience hampered her performance on certain projects, Zsofka was well aware of her inexperience at the time of hiring. In fact, in the beginning, when Chamberlin was least experienced, Zsofka considered her promotional work "fabulous," praised her willingness to volunteer for work projects, and lauded her intelligence and aptitude. To be sure, Zsofka's appraisal of Chamberlin's work performance and professional skills changed. Yet the district court reasonably could find that Zsofka's diminished esteem for Chamberlin had less to do with her work performance and employment skills than with Zsofka's displeasure at Chamberlin's unwavering determination to resist his overtures. We conclude that the evidence supported a finding that Chamberlin's employment was not terminated due to deficiencies in her employment qualifications or her work performance, but in retaliation for stonewalling Zsofka's sexual advances.[10]

In the circumstances of the present case, the fifth and final element—*respondeat superior* liability—flows from the establishment of the fourth element. As was stated in *Henson*, 682 F.2d at 910, "an employer is strictly liable for the actions of its supervisors that amount to sexual discrimination or sexual harassment resulting in tangible job detriment to the subordinate employee." As Zsofka was not only Chamberlin's supervisor, but the president of defendant 101 Realty, *respondeat superior* liability is indisputable.

Once Chamberlin demonstrated a prima facie *quid pro quo* sexual harassment claim, with direct evidence of discriminatory intent, the burden of persuasion shifted to the defendants to establish "by a preponderance of the evidence that the same decision would have been made absent the discrimination." *Lipsett*, 864 F.2d at 899 (quoting *Fields v. Clark University*, 817 F.2d 931, 937 (1st Cir.1987)). Notwithstanding defendants' contrary protestations, the district court reasonably determined that Zsofka made five sexual advances to Chamberlin during a four to five week period. Whether or not each or any sexual overture was sufficiently crude or heavy-handed to exclude absolutely all ambiguity as to its intendment, there can be no significant question that their common aim was sexual in nature.

In this connection we examine the exculpatory reasons offered by Zsofka in explanation of Chamberlin's discharge: that she was not dedicated to her work,[11] did not have the requisite commitment to the company,[12] and lacked sufficient architectural design experience.[13] The record provides sufficient support for the district court's conclusion that these were pretextual justifications. As did the district court, we conclude that Chamberlin's firing was not precipitated by Chamberlin's work performance or by any shortcoming in her employment skills or aptitude, but by her unwavering determination to resist Zsofka's sexual advances.

---

**10.** The interval between the last sexual advance, which appears to have occurred near mid-June, and Chamberlin's discharge on September 1, does not preclude a finding that the discharge was a consequence of her rejection of Zsofka's sexual advances. *See, e.g., Tomkins v. Public Serv. Elec. & Gas Co.*, 568 F.2d 1044 (3d Cir. 1977) ("firing" more than one year after last advance, no bar to *quid pro quo* claim). In the present case, the delay poses less concern in any event since Zsofka was on vacation in August.

**11.** Chamberlin worked fifty hours a week from February to mid-May, and between sixty and seventy hours a week thereafter. The company comptroller corroborated that Chamberlin worked nine hours a day during the thirteen-day work period August 3–19, not including the time she worked at home, most nights and weekends, on her employment responsibilities with 101 Realty.

**12.** Under virtually any standard, Chamberlin demonstrated dedication to her work and her employer. Zsofka himself praised Chamberlin's aptitude, lauded her intelligence, and said that she did a "fabulous job" on promotional work and often volunteered for work.

**13.** The only significant shortcoming in Chamberlin's employment qualifications seems to have been her limited experience in architectural design. The district court supportably found that Zsofka, at the time of hiring, was well aware of Chamberlin's limited experience and that she was not a registered architect.

*Wrongful Discharge Claim*

■ The defendants appeal the district court's award of judgment on Chamberlin's wrongful discharge claim under New Hampshire law, on the grounds that (1) there was no retaliatory discharge, and (2) the district court erroneously applied the public policy exception to New Hampshire's "employment at will" doctrine (citing *Howard v. Dorr Woolen Co.,* 120 N.H. 295, 297, 414 A.2d 1273, 1274 (1980)) (construing public policy exception "to apply only to a situation where an employee is discharged because [she] performed an act that public policy would encourage, or refused to do that which public policy would condemn").[14] At the root of defendants' present challenge is Chamberlin's entitlement to prejudgment interest on the wrongful discharge claim under New Hampshire law.[15] New Hampshire law provides for an award of prejudgment interest. *See* N.H.Rev. Stat.Ann. § 524:1–b (1989); *National Grange Mutual Ins. Co. v. Smith,* —— N.H. ——, 574 A.2d 1386 (1990).

■ Only one award of damages was recoverable by Chamberlin, whether under Title VII, *see* 42 U.S.C. § 2000e–5(g), or under the wrongful discharge provisions of New Hampshire law, *see, e.g., Ives v. Manchester Subaru, Inc.,* 126 N.H. 796, 498 A.2d 297 (1985). *See Doty v. Sewall,* 908 F.2d 1053, 1063 (1st Cir.1990) (where "claims under federal and state law, and the damages awarded therefore (sic), are identical, a plaintiff is entitled to select the body of law under which the damages will be paid"). *Accord Freeman v. Package Machinery Co.,* 865 F.2d 1331, 1345 (1st Cir.1988) ("Nor does the fact that the damages held to be recoverable under … [state law] largely replicated those recover-

able under … [federal law] disqualify plaintiff from receipt of prejudgment interest on the common portion of the award. To be sure, a plaintiff is entitled to only one full recovery, no matter how many different legal grounds may support the verdict … but there is no basis for allowing the losing party to pick which of the overlapped awards it prefers to pay. In collecting the fruits of his victory … [plaintiff] was concededly entitled to only a single slice of the pie—but the choice of the slice was his.").

■ Chamberlin was an employee at will. *See Panto v. Moore Business Forms, Inc.,* 130 N.H. 730, 739, 547 A.2d 260, 267 (1988) (absent written employment contract, collective bargaining agreement, legislation, or judicially created exception, employment is at will). An at will employee may assert a successful wrongful discharge claim under New Hampshire law by showing (1) that her discharge was "motivated by bad faith, malice, or retaliation," *Cloutier v. Great Atlantic & Pac. Tea Co.,* 121 N.H. 915, 436 A.2d 1140, 1143 (1981), and (2) that she was discharged because she "performed an act that public policy would encourage, or refused to do that which public policy would condemn," *id.* (quoting *Howard,* 120 N.H. at 297, 414 A.2d 1273).

■ Chamberlin was discharged because she did not submit to sexual discrimination in the workplace, clearly a retaliatory termination from employment. Sexual discrimination in employment contravenes New Hampshire public policy. *See* N.H.Rev.Stat.Ann. § 354–A:8 ("It shall be an unlawful discriminatory practice … [f]or an employer, because of the … sex … of any individual, … to discharge from employment such individual or to discrimi-

**14.** The district court found and ruled as follows:

Plaintiff has here sustained her burden of proving by a preponderance of the evidence that she was discharged in retaliation for failure to respond to Zsofka's advances. Such discharge was clearly violative of public policy in that it comprises sexual discrimination in violation of 42 U.S.C. § 2000e–2(a), *supra,* and an applicable state statute as set forth in Revised Statutes Annotated ("RSA") 354–A:8I. Plaintiff has sustained her burden of proving that each of the defendants herein wrongfully

discharged her in violation of New Hampshire law.

**15.** The district court erroneously assumed that "prejudgment interest is not available under Title VII," *see Loeffler v. Frank,* 486 U.S. 549, 557–58, 108 S.Ct. 1965, 1970, 100 L.Ed.2d 549 (it "surely is correct" that Title VII authorizes prejudgment interest as part of the backpay remedy in suits against private employers); *accord Conway v. Electro Switch Corp.,* 825 F.2d 593, 602 (1st Cir.1987)). Nevertheless, neither party appeals that determination.

nate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification."). Accordingly, Chamberlin was entitled to recover prejudgment interest on the award of damages for wrongful discharge under New Hampshire law.[16]

*The district court judgment is affirmed.*

## ORDER OF COURT

Appellant's petition for rehearing en banc is also treated as a petition for rehearing. After consideration of the petition for rehearing by the panel of judges that rendered the decision in this case,

It is ordered that the petition for rehearing is denied. *See Cumpiano v. Banco Santander Puerto Rico,* 902 F.2d 148, 155 (1st Cir.1990).

---

16. The two year interval between trial and the entry of judgment by the district court, while not to be encouraged, does not warrant reversal.

*See Fernberg v. T.F. Boyle Transp. Inc.,* 889 F.2d 1205, 1209 n. 6 (1st Cir.1989) (two and one half year delay in filing decision).