## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,

v.

## HORIZONS HOTEL CORPORATION, d/b/a Carib Inn Hotel, Defendant.

### Civ. No. 90–1633(PG).

United States District Court, Puerto Rico.

Sept. 29, 1993.

---

Delner Franklin–Thomas, E.E.O.C., New York City, for plaintiff.

Luis F. Padilla, San Juan, PR, for defendant.

## OPINION AND ORDER

PEREZ–GIMENEZ, District Judge.

On July 14 and 15, 1993 this sexual harassment case brought by the Equal Employ-

ment Opportunity Commission ("E.E.O.C.") on behalf of Myriam Vizcarrondo Carn pursuant to Title VII of the Civil Rights Act of 1964[1] was litigated in a bench trial before the undersigned.[2] Subsequently, the parties timely filed their post-trial briefs. Having considered all the evidence before it, the Court hereby concludes that (i) Ms. Vizcarrondo Carn indeed was a victim of sexual harassment by her supervisor, and (ii) the defendant is therefore liable to her for such conduct as well as for discharging her from her employment.

## I. The Facts

### (i) The sexual harassment

On or about June 1, 1986, Myriam Vizcarrondo Carn ("plaintiff")[3] accepted an employment offer to work as a cashier at La Tinaja Restaurant at the Carib Inn. (Tr. 12). Her shift was from 6:30 a.m. to 3:00 p.m. six days a week. Three individuals supervised her: (i) Juvenico Flores—the restaurant's food and beverage supervisor, (ii) Félix Vélez—the *maitre d'* and floor supervisor, and (iii) Ramón Pantojas—the hotel's night auditor. (Tr. 14). The latter of these three gentlemen, as we shall shortly see, was the individual who sexually harassed plaintiff.

Pantojas worked from 11:00 p.m. until 7:00 a.m. Monday through Friday. (Tr. 91). His departure thus coincided with plaintiff's arrival to work every morning. Immediately after plaintiff began working for the defendant, Pantojas approached her with a steady stream of comments about her body. He would make these as she collected the monies for the cash register and would also follow her to the restaurant and sit at a table near the cash register. During her first week at the restaurant, Pantojas invited plaintiff to his hotel room at least on two occasions.[4] (Tr. 15). She rejected his advances, however, to no avail. His comments about her body continued almost on a daily basis.[5] (Tr. Day 2 at 17).

Plaintiff complained about Pantojas' sexually offensive conduct to: (i) Héctor Rodríguez Estrada—the hotel's general manager, (ii) Migdoel Sánchez—the head of the accounting department and also Pantojas' supervisor, (iii) Juan Gómez—resident manager, and (iv) Félix Vélez—the floor supervisor of the restaurant. (Tr. 17–18).

Mr. Gómez testified at trial that plaintiff complained to him *twice* about Pantojas' offensive behavior, specifically that Pantojas told her she had a beautiful body and had invited her to his room at the hotel. (Tr. Day 2 at 4, 16–17). He further testified that he believed plaintiff was telling the truth as he had worked with Pantojas in the late seventies and Pantojas was always saying things to the girls he worked with him. (Tr. Day 2 at 5). Lastly, he testified that he spoke with Héctor Rodríguez Estrada and Migdoel Sánchez about plaintiff's complaint, yet did not know whether they took any action. (Tr. Day 2 at 5–6).

Mr. Vélez testified at trial that on at least two occasions he heard Pantojas make sexu-

---

1. 42 U.S.C. § 2000e.

2. This action was commenced on May 8, 1990. Subsequently, Congress, via the Civil Rights Act of 1991, Pub.L. No. 102–166, amended Title VII by affording plaintiffs the right to a jury trial. Plaintiff, however, never requested via amended complaint that the Civil Rights Act be applied retroactively to her case so as for the same to be tried before a jury rather than before the undersigned—an issue which the Supreme Court has agreed to address this upcoming term. *See Landgraf v. U.S.I. Film Productions,* 968 F.2d 427, 432 (5th Cir.1992), *cert. granted,* — U.S. ——, 113 S.Ct. 1250, 122 L.Ed.2d 649 (1993).

3. Although the E.E.O.C. is the nominal plaintiff in this case, the Court shall nonetheless refer to Vizcarrondo Carn as "plaintiff" for simplicity's sake.

4. Pantojas had been staying thereat because of a strike at the hotel.

5. Pantojas' comments ranged from telling plaintiff that she had a beautiful body to telling her that he knew that she was in very good condition. He also told her sexual puns with double meaning (i.e. "if the breast looks like this how is the rest?"). He called her legs "sweet potatoes" and "delicious calves." (Tr. 21).

   Mr. Félix Vélez, one of plaintiff's supervisors, also testified at trial that at least on two occasions he overheard Pantojas telling plaintiff "you are in good shape" and "mama you really look good." (Tr. 76). In Vélez's opinion, Pantojas spoke in a sexually offensive manner. (Tr. 76–77).

ally offensive comments to plaintiff. *See* Footnote 5, *supra.* He further testified that plaintiff had complained about Pantojas to him. Also, he had observed plaintiff crying on several occasions. Upon asking her why she was crying, she replied that Pantojas had been harassing her. (Tr. 77).

### (ii) The discharge

On or about August 23, 1986,—over two and a half months after plaintiff commenced working at the hotel—Pantojas called plaintiff to come speak with him. She refused to do so. Pantojas then stated that she had to come over because he wanted to point out a mistake she made. Once again she refused, believing he was up to his old sexual harassment tricks.[6] Pantojas then told plaintiff that he was going to report her. She responded that he should indeed write her up. (Tr. 25).

On the same above date, Pantojas wrote a complaint to Margarita Molina, the comptroller. (Exhibit 13). In said letter he stated that plaintiff had made errors regarding the "paid" and "charge" accounts in the restaurant. Ms. Molina in turn, wrote a letter to plaintiff informing her that she should not mix the "paid" and "charge" accounts. (Exhibit 14). When plaintiff received the letter from Ms. Molina on August 26, she immediately went to Mr. Juvenico Flores—the restaurant's food and beverage supervisor—and told him that Pantojas had complained of her work solely because she rejected his sexual advances. Mr. Flores subsequently called Ms. Molina and arranged for plaintiff to meet her so that Ms. Molina could address the problem. Plaintiff met with her the next day, whereupon Ms. Molina informed her that she was going to fully investigate the matter. (Tr. 25–28).

On September 1, after finishing her shift, plaintiff received a termination letter dated August 28, 1986—*one day after plaintiff spoke with Ms. Molina.* (Exhibit 15). The letter was signed by Gloria Pantojas, director of personnel and daughter of Ramón Pantojas.[7] (Tr. 30).

### II. Legal Analysis

Title VII prohibits sexual harassment in the workplace. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 65–66, 106 S.Ct. 2399, 2404–2405, 91 L.Ed.2d 49 (1986). Our Circuit has recognized that a sexual harassment claim may be brought under either of two distinct theories: "quid pro quo" and "hostile environment." *Chamberlin v. 101 Realty, Inc.,* 915 F.2d 777, 783 (1st Cir.1990). *Accord Carrero v. New York City Housing Authority,* 890 F.2d 569, 577–79 (2d Cir. 1989); *Sparks v. Pilot Freight Carriers,* 830 F.2d 1554, 1557–1561 (hostile environment), 1564–1566 (quid pro quo harassment) (11th Cir.1987). *See also* 29 C.F.R. § 1604.-11(a)(1)(2) (E.E.O.C. guidelines). As discussed below, the Court finds the defendant liable under both theories.

### (i) Quid Pro Quo Harassment

■ Said form of sexual harassment exists "where a supervisor conditions the granting of an economic or other job benefit upon the receipt of sexual favors from a subordinate, or *punishes* that subordinate for refusing to comply." *Chamberlin,* 915 F.2d at 783 (quoting *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 897 (1st Cir.1988)) (emphasis added). In order to succeed in a quid pro quo harassment claim a plaintiff must establish the existence of five factors: (i) that the plaintiff-employee is a member of a protected group; (ii) that the sexual advances were unwelcome; (iii) that the harassment was sexually motivated; (iv) that the employee's reaction to the supervisor's advances affected a tangible aspect of her employment; and (v) that *respondeat superior* liability has been established. *Id.* at 783.

■ Clearly, the first factor has been established in this case as plaintiff unquestionably is a female. Plaintiff has also established the second factor—that the sexual advances were unwelcome. According to her

---

6. Once before, Pantojas had asked plaintiff to come discuss a mistake which he was later unable to detect.

7. The hotel had a ninety day probationary period for new employees. Plaintiff was discharged one day before her term was up. (Tr. 84).

testimony, she considered Pantojas' sexual advances unwelcome since the start of her job.[8] She even complained to her superiors about Pantojas' conduct.

Plaintiff has further established the third factor—that the harassment be based on sex. Mr. Gómez, who has known Pantojas since the seventies, testified that Pantojas usually treated women in the same sexually offensive manner he treated plaintiff. *See* Tr. Day 2 at 16–20.

The fourth factor—that plaintiff's rejection of harassment resulted in a tangible job detriment—has also been established by plaintiff. Pantojas wrote the August 23, 1986 report to Margarita Molina alleging that plaintiff was not performing her cashier duties adequately. Nonetheless, the defendant at trial was unable to pinpoint a single instance of plaintiff committing any error in the restaurant logs prior to August 23—the day when Pantojas asked plaintiff to approach him to discuss a mistake in her log.[9] This evidence, or better stated—lack thereof, thus, makes it more likely than not that Pantojas' allegation that he wanted to discuss an error with plaintiff was merely a subterfuge to further harass her. Plaintiff's decision not to comply with Pantojas' request led to his filing an incident report with Ms. Molina—a report which ultimately led to her termination.

The fifth and final factor—that the defendant is legally responsible for Pantojas' acts—is also met in this case. An employer is strictly liable for the quid pro quo harassment of an employee by his/her supervisor. *See Chamberlin,* 915 F.2d at 785. Pantojas denied at trial having any "supervisory" role at the defendant's restaurant. Nonetheless Pantojas' influence in plaintiff's discharge *de facto* leads to just the opposite conclusion. Plaintiff's retention as an employee ultimately rested on Pantojas' characterization of her performance as a cashier. Pantojas himself acknowledged at trial that it was his letter of complaint (Exhibit 13) that prompted Ms. Molina to write the August 25 warning letter (Exhibit 14). (Tr. 109–110).

Taking matters one step further, the defendant is also liable for failing to address Pantojas' conduct towards plaintiff. At trial both Félix Vélez and Juan Gómez testified that plaintiff complained to them about Pantojas. Vélez even admitted hearing Pantojas making sexually offensive comments to plaintiff. Management, however, did not take any type of remedial measure.

*(ii) Hostile Work Environment*

■ The elements a plaintiff must prove to succeed in such type of sexual harassment claim are: (i) that she is a member of a protected class; (ii) that she was subject to unwelcome sexual harassment; (iii) that the harassment was based upon sex; (iv) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive working environment; and (v) that some basis for employer liability has been established. *Meritor,* 477 U.S. at 66–73, 106 S.Ct. at 2405–2408.

■ Based on the same rationale in this Court's quid pro quo analysis, *supra,* plaintiff meets the first three prongs of the hostile environment test. The fourth prong—the severity and pervasiveness of Pantojas' conduct towards her—is also met. Pantojas commenced to harass plaintiff her very first week on the job. His conduct further caused plaintiff to cry on more than one occasion, and to report his conduct to several managerial employees.

The final prong is also met in this case as the defendant hotel's management was well aware of Pantojas' conduct. Juan Gómez testified at trial that he was aware of such incidents and that he also informed Héctor

---

8. Pantojas, while on the witness stand, denied having made any such statements to plaintiff. (Tr. 101) However, the Court does not find said testimony credible, especially in view of the fact that plaintiff's testimony of his conduct is corroborated by Félix Vélez's testimony that he heard Pantojas at least on two occasions make remarks about plaintiff's physique. The record also lacks any denial by the defendant other than that by Pantojas that Pantojas' alleged conduct indeed took place.

9. To the contrary, Mr. Vélez testified that he never read an incident report regarding plaintiff. (Tr. 81).

Rodríguez Estrada—the highest managerial employee in the hotel—of plaintiff's complaints. (Tr. Day 2 at 5). Hence, the evidence shows that the defendant hotel had knowledge of plaintiff's hostile work environment created by Pantojas.

*(iii) Liability*

■ In a mixed motive case [10], once plaintiff presents her *prima facie* case of discrimination [11], the burden of proof shifts to the defendant to show by a preponderance of the evidence that the same decision involving the plaintiff would have been made absent the discrimination. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244–45, 109 S.Ct. 1775, 1787–88, 104 L.Ed.2d 268 (1989); *Fields v. Clark University*, 966 F.2d 49, 52 (1st Cir. 1992); *Chamberlin*, 915 F.2d at 782.[12]

■ The defendant in this case contends that the plaintiff was discharged because her performance as a cashier was deficient. The Court however concludes based on the evidence presented at trial that the defendant indeed discriminated in its decision to discharge plaintiff in an impermissible manner, and further finds that the defendant did not

even come close to the preponderance of evidence threshold so as to avoid liability.[13] At trial the defendant produced a set of cashier logs (Exhibit A) as sole evidence of plaintiff's alleged deficient performance. According to these records, plaintiff made no mistakes during her first forty one days on the job. The mistakes alleged by the defendant on the other hand are lilliputian in nature as they amount to no more than $20.00.[14] Lastly, it was not until August 23, 1986—over two and a half months after plaintiff had been on the job—that Pantojas attempted to discuss the mistakes made by plaintiff with her. With such evidence before it, the Court can only conclude one thing— that the defendant's sole proffered reason for discharging the plaintiff was indeed pretextual.

### III. Conclusion

The Court finds that plaintiff in this case has more than met her burden of proving by a preponderance of the evidence that she was the victim of sex discrimination. She proved by direct evidence that she was the victim of sexual harassment under both the "quid pro

10. A "mixed motive" case is one where a decision regarding an employee was the product of legitimate and illegitimate motives. The Court shall treat this case as such since allegedly both types of motive are present in this instance. Plaintiff alleges that the decision to terminate her was prompted by her sex. The defendant on the other hand contends that it was prompted by her deficient work performance.

11. Since plaintiff presented direct evidence of discrimination, the Court need not apply the burden-shifting analysis provided by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

12. This was the liability standard in our Circuit at the times the facts of this case developed and the complaint was filed before the Court. Congress, however, was much troubled by the *Price Waterhouse* standard of liability and overrode it via the Civil Rights Act of 1991. Now, where a plaintiff proves by direct evidence that unlawful discrimination played a role which affected her employment with the defendant, liability automatically arises on the defendant's part. *See Bibbs v. Block*, 778 F.2d 1318 (8th Cir.1985) (en banc). *See also* 42 U.S.C. § 2000e–5(g)(1); H.R.Rep. No. 102–40(I), 1991 *U.S.C.C.A.N.* 549, 586 (wherein it clearly appears that Congress

preferred the *Bibbs* standard of liability over the *Price Waterhouse* one). However, after a finding of unlawful discrimination is made by a court, a defendant is still allowed to mitigate the scope of relief by proving by a preponderance of the evidence that the plaintiff would have been dismissed in this case in the absence of discrimination. *See Bibbs, supra* at 1324; 42 U.S.C. § 2000e–5(g)(2)(A).

13. Although the retroactivity of the Civil Rights Act of 1991 is a unsettled issue in our Circuit at this juncture, *see* footnote 2, *supra*, even if this Court were to employ the new, and more lax, standard of liability to the facts of this case, the defendant would nonetheless be liable as plaintiff clearly demonstrated that she was the victim of sex discrimination.

14. Based on Exhibit A, plaintiff on the average performed at least fifty five (55) transactions per day on each day of her 90 day probationary period. Out of approximately 4,300 transactions she performed (13 weeks × 6 days × 55 transactions per day) she made seven mistakes according to the defendant. This amounts to a 00.16% rate of error. If the defendant was looking for plaintiff's work to be performed with a 0.00% margin of error, it was, in the Court's opinion, asking for too much.

**16**

quo" and "hostile work environment" theories. She further proved that this form of sex discrimination was the sole cause of her termination. The defendant, on the other hand, did not prove by a preponderance of the evidence that it would have nonetheless discharged plaintiff for a non-prohibited reason. The defendant is thus liable to plaintiff under Title VII.

The E.E.O.C. shall submit within thirty (30) days its memorandum on damages and other requested relief. The defendant shall file an opposition thereto (if any) within twenty days thereafter.

**IT IS SO ORDERED.**