Rockingham
Nos. 2003-271
2003-272

NEW ENGLAND HOMES, INC.

v.

R.J. GUARNACCIA IRREVOCABLE TRUST & a.

Argued: November 6, 2003
Opinion Issued: April 16, 2004

*J. Kirk Trombley, P.A.*, of Barrington (*J. Kirk Trombley* and *Tracy A. LaChance* on the brief, and *Mr. Trombley* orally), for the plaintiff.

*Chubrich & Harrigan, P.A.*, of Portsmouth (*Michael E. Chubrich* on the brief and orally), for the defendants.

BROCK, C.J., retired, specially assigned under RSA 490:3. In these consolidated cases, the plaintiff, New England Homes, Inc., appeals two

orders of the Superior Court (*Lewis*, J.) upholding New Hampshire Department of Labor (DOL) rulings that it owed the employees, R.J. Guarnaccia and George Cooley, unpaid commissions and liquidated damages. We affirm in part, reverse in part, and remand.

The DOL made the following findings of fact which are undisputed on appeal. Guarnaccia and Cooley worked as regional sales managers for the plaintiff until they resigned in February 2002. During their employment, their commission structure was set forth in a Letter of Understanding (Letter).

At the time of his resignation, Guarnaccia had sold twelve modular homes, which were in varying stages of manufacture and delivery. Subsequent to his resignation, two of the twelve orders were cancelled. Of the remaining ten homes he had sold, one was the property of Donahue Realty Trust. Cooley had secured orders for twenty-two homes, which the plaintiff had accepted, at the time of his resignation.

Guarnaccia and Cooley filed separate wage claims with the DOL in February 2002, alleging that the plaintiff failed to pay them their commissions as required by RSA 275:43, I (1999), and that the plaintiff was also liable for liquidated damages pursuant to RSA 275:44, IV (1999). Following a hearing, Guarnaccia was awarded $25,876.40 in commissions and $23,197.70 in liquidated damages. Cooley was awarded $41,232.92 in commissions and $41,232.92 in liquidated damages.

The plaintiff appealed both decisions. The superior court upheld the DOL's decision to award commissions and liquidated damages, but lowered the awards due to each employee.

On appeal, the plaintiff argues that the court erred in: 1) ordering that commissions were earned on homes that were delivered and paid for after Guarnaccia's and Cooley's resignations; 2) including the sale of a home owned by Donahue Realty Trust when calculating Guarnaccia's commissions; 3) excluding evidence of volume-based discounts when calculating Cooley's commissions; and 4) awarding liquidated damages. We address each of the plaintiff's arguments in turn.

"We will affirm the superior court's factual findings unless they are unsupported by the evidence and we will affirm the superior court's legal rulings unless they are erroneous as a matter of law." *Richmond v. Hutchinson*, 149 N.H. 749, 751 (2003).

## I. Commissions Earned

The plaintiff first contends that the court erred in ordering that commissions were earned on homes delivered and paid for after the employees had resigned. Specifically, it argues that as a matter of law, an

"employee is entitled to commissions on sales *closed*," as opposed to sales pending, absent an agreement otherwise. *Galloway v. Chicago-Soft*, 142 N.H. 752, 757 (1998) (emphasis added). The plaintiff argues that because both the plain language of the Letter and the practice of the parties indicate that sales were closed and commissions were earned "only when the modular home was delivered to the builder, set on the home owners' property, and New England Homes was paid in full," the employees are therefore not entitled to commissions on sales that were merely accepted, but not closed, prior to their resignation. The employees respond that as a matter of law, they earned commissions when the orders they solicited were accepted by the plaintiff. *See id.* at 756.

■ The parties agree that our ruling in *Chicago-Soft* governs here. In that case, we stated that, generally, "a person employed on a commission basis to solicit sales orders is entitled to his commission when the order is accepted by his employer. The entitlement to commissions is not affected by the fact that payment for those orders may be delayed until after they have been shipped." *Id.* (quotation omitted). Although in *Chicago-Soft*, as pointed out by the plaintiff, we stated that an "employee is entitled to commissions on sales closed," *Chicago-Soft*, 142 N.H. at 757, the remainder of the opinion makes clear that closed sales are synonymous with accepted orders. Moreover, an examination of the cases upon which we based our standard in *Chicago-Soft* indicates that the employer's acceptance of an order signals closure of the sale; pending sales are those yet to be accepted, not those yet to be "closed" pursuant to the employer's standards. *See Vector Engineering & Mfg. Corp. v. Pequet*, 431 N.E.2d 503, 504-05 (Ind. Ct. App. 1982); *Oken v. National Chain Co.*, 424 A.2d 234, 235 (R.I. 1981).

■ In *Chicago-Soft*, we further stated that "[t]his general rule may be altered by a written agreement by the parties or by the conduct of the parties which *clearly* demonstrates a different compensation scheme." *Chicago-Soft*, 142 N.H. at 756-57 (quotation omitted). If the employer "intends for commissions to be calculated differently, either the contract language or the employer's acts must unambiguously demonstrate a departure from the general rule." *Id.* at 757. The question before us, then, is whether either the compensation schedule set forth in the Letter or the plaintiff's acts clearly demonstrate a deviation from the general rule articulated in *Chicago-Soft*. We do not believe they do.

■ The Letter signed by the employees states, in relevant part: "The commission will be 3½% (three and one-half percent) of the Net

Builder/Dealer Price ... unless any one of the following has not happened," and then sets forth a list of requirements that must be met in order to earn the full commission. At the end of that list, the Letter concludes by stating: "**Note:** If any of the above responsibilities are not met, a fee of one-half of one percent (½%) per contract will be deducted from the sales manager's commission—Commissions are credited to [the sales manager]'s account when contract and terms are *paid in full!*"

Nothing in the plain language of the Letter clearly demonstrates that commissions are earned at any time other than when the plaintiff accepts the order, *see id.*, nor does the Letter explicitly state that regional sales managers will "be divested of any entitlement to commission by virtue of [their] termination." *Id.*; *see also Diana v. Burnside Motors, Inc.*, 304 A.2d 222, 224 (Conn. C.P. 1973).

Although the plaintiff argues that the plain meaning of the final sentence of the Letter indicates that commissions are earned when the home is set and the account is paid in full, we disagree. The Letter states only that commissions are *credited* when the contract is fully paid. While the plaintiff argues that "credited" means "earned," it is equally plausible, as the employees allege, that "credited" is synonymous with "payable," thereby affecting only when commissions are to be *paid* out. Given that "the parties to the contract could reasonably disagree as to the meaning of [this contractual] language," the final sentence of the Letter is ambiguous, *N.A.P.P. Realty Trust v. CC Enterprises*, 147 N.H. 137, 139 (2001), and therefore does not "unambiguously demonstrate a departure from the general rule." *Chicago-Soft*, 142 N.H. at 757. If the plaintiff desired to make regional sales managers' commissions dependent upon completion of the sale—including shipment, delivery, and payment—"it could have provided for such a contingency in clear and unambiguous language." *Oken*, 424 A.2d at 235-36; *see also Burnside Motors*, 304 A.2d at 224.

Moreover, nothing in the one-half of one percent reduction provision alters the general rule articulated in *Chicago-Soft*. The plain meaning of the provision makes clear that failure to satisfy the specific requirements set forth in the Letter does not preclude commissions from vesting, but merely reduces the otherwise fully-earned commission to three percent. As the employees assert, for this provision to have meaning, the right to earn the three and one-half percent commission must have already vested. To hold otherwise renders the penalty provision mere surplusage.

■ Having concluded that nothing in the Letter alters when commissions were earned, we next examine whether the plaintiff's acts unambiguously demonstrated that commissions were earned at some time

other than when orders were accepted. *See Chicago-Soft*, 142 N.H. at 757. Although the plaintiff argues that its conduct altered the general rule by requiring salesmen to "manage the sale beyond the mere submission of the purchase order to assure that the sale is completed," we disagree. The mere existence of post-acceptance responsibilities does not unambiguously demonstrate that commissions are earned at some time other than when orders are accepted. Especially in light of the Letter's provision penalizing failure to satisfy those requirements, the existence of further requirements alone is insufficient to depart from the general rule of *Chicago-Soft*.

■ The plaintiff's "long-standing practice of paying commissions . . . following delivery" likewise fails to unambiguously demonstrate a departure from the general rule. "[S]uch evidence is not clearly indicative" of whether an agreement existed whereby the employees earned commissions at some time other than when orders were accepted by the company. *Id.* at 758. The plaintiff's practice may merely have been to delay payment, which, as stated above, does not affect the entitlement to commissions. *Id.* at 756.

Finally, we are not persuaded by the out-of-state cases that the plaintiff cites. They neither rely upon nor examine the *Chicago-Soft* standard we utilize, and, thus, we decline to adopt their reasoning here.

Because we find that nothing in the Letter or the parties' conduct alters the general rule in *Chicago-Soft*, we conclude that the trial court did not err in upholding the DOL's decision to award commissions.

### A. Guarnaccia's Commission

The plaintiff next contends that if Guarnaccia is entitled to commissions, the court erred in awarding a commission for his sale of a home owned by Donahue Realty Trust (trust). The plaintiff asserts that by including the home's sale, the trial court impermissibly pierced the corporate veil. To the contrary, Guarnaccia argues that evidence exists to support the DOL's conclusion that the plaintiff owed him a commission on that sale.

Although it appears that Dan Donahue was the president of the plaintiff, New England Homes, Inc., as well as trustee of the trust, we disagree with the plaintiff's characterization that the superior court pierced the corporate veil. When courts pierce the corporate veil, they "assess individual liability where the owners have used the corporate identity to promote injustice or fraud." *Norwood Group v. Phillips*, 149 N.H. 722, 724 (2003). They "disregard the fiction that the corporation is independent of its stockholders and treat the stockholders as the corporation's 'alter

egos.'" *Id.* No such result occurred here. The superior court did not hold Dan Donahue, president of New England Homes, individually liable for Guarnaccia's commissions. Rather, it found evidence in the record to support the DOL's finding that Guarnaccia sold the home on behalf of the plaintiff, not the trust. Pursuant to our standard of review, we need only ask whether the evidence supports this finding. *See Richmond,* 149 N.H. at 751. We believe that it does.

■ During the arbitration, when asked why he was seeking a commission for the sale of the home owned by the trust, Guarnaccia testified that:

> [W]e had this model on the premises, and Dan was planning to do some expansion to the ... area and we had to get rid of the model home, and Dan asked if all of us salesmen if we could sell it. So I contacted my builders .... So one of my builders stepped forward, and struck a great deal to come in and pay Dan for it, and he did, and he gave Dan a check ....
>
> ....
>
> ... Dan had stated to me that he would pay me when the house was delivered ....

Consequently, we cannot conclude that the trial court erred by awarding a commission to Guarnaccia for the sale of the home owned by the trust.

*B. Cooley's Commissions*

We next address the plaintiff's contention that if Cooley is entitled to commissions, the court erred in excluding evidence of volume discounts when calculating his commissions. Specifically, the plaintiff argues that the "hearing officer agreed to hold open the record until August 28, 2002, for the sole purpose of submitting a schedule of the discounts applied for homes delivered during the fiscal year of May 1, 2001 through April 30, 2002." Because the court found that "New England Homes submitted evidence respecting [the volume discount] amount only after the last DOL hearing session had ended," and thus refused to reduce Cooley's commissions by $277 in accordance with the commission schedule, the plaintiff argues that the trial court erred.

Cooley argues that although he "does not allege or contend that this minor and modest arithmetic mistake ... was intentionally injected into the administrative record by Employer or Employer's counsel ... [he] does contend ... that this trivial mistake was a self-inflicted wound" caused by the plaintiff's actions. Based upon the plaintiff's "confusing and

unhelpful 'Arithmetic Stipulation,'" Cooley asks us to find that the plaintiff waived its right to complain about the mistake.

■ Based upon our review of the record, we conclude that the trial court's ruling is not supported by the evidence. *See id.* The arbitration transcript expressly states that the hearing officer held the record open for approximately one week following the final day of the arbitration specifically for the submission of evidence concerning volume discounts. The record further reflects that the volume-discount schedule was filed prior to the deadline set by the hearing officer. Consequently, the court erred in ruling that the record had closed and in refusing to consider the volume discount when calculating Cooley's commissions.

In characterizing the court's action as an "arithmetic mistake," we note that Cooley appears to concede that the court's calculation was, in fact, erroneous. Moreover, we find Cooley's remaining claim, that the plaintiff caused the error and thus waived its right to appeal, to be without merit and to warrant no further discussion. *See Vogel v. Vogel*, 137 N.H. 321, 322 (1993). Accordingly, we remand for the court to reduce the award to Cooley by the appropriate amount of volume discount.

## II. Liquidated Damages

Finally, the plaintiff contends that the superior court erred in awarding liquidated damages. In support of this contention, the plaintiff argues that the record is devoid of any evidence that it acted "willfully and without good cause" in withholding wages—the statutory prerequisites for awarding liquidated damages. RSA 275:44, IV. Rather, it argues that it "has maintained a 'bona fide belief' that it is not obligated to pay ... commissions" based upon the language of the Letter, its custom with regard to commissions, the nature of its industry generally, and the rulings of other courts denying such awards.

The employees point to a list of facts relied upon by the court, including the DOL's finding that previously fired employees received commissions on sales paid in full subsequent to their termination, to support their claim that the plaintiff acted willfully and without good cause in withholding wages. They request that we remand with instructions to award attorney's fees.

■ Pursuant to RSA 275:44, IV, "If an employer willfully and without good cause fails to pay an employee wages as required under ... this section, such employer shall be additionally liable to the employee for liquidated damages." We have construed "willfully and without good cause" to mean "voluntarily, with knowledge that the wages are owed and

despite financial ability to pay them." *Chisholm v. Ultima Nashua Indus. Corp.*, 150 N.H. 141, 146 (2003) (quotation omitted); *see also Ives v. Manchester Subaru, Inc.*, 126 N.H. 796, 802 (1985). A willful act, however, does not include "an accident or an act committed on the basis of a mistake of fact." *Richmond*, 149 N.H. at 751 (quotation omitted). "Thus, no liquidated damages are available when an employer's refusal to pay wages is based upon bona fide belief that he is not obligated to pay them." *Id.* (quotation omitted).

■ In the instant case, we conclude that the court erred as a matter of law in finding that the plaintiff had no bona fide belief for withholding wages. In *Chisholm*, we disagreed with an employer's claim that, "as a matter of law, where there is a legitimate dispute regarding the existence of an enforceable contract, an employer cannot be found to have acted willfully and without good cause" in withholding wages. *Chisholm*, 150 N.H. at 145–46. Our ruling in that case, however, was predicated in large part upon the fact that the evidence supported a finding that the employer did not have a good faith belief that the contract was unenforceable in the first place. *Id.* at 146; *see also Richmond*, 149 N.H. at 752. Here, based upon the ambiguity in the Letter, we conclude that there was a legitimate dispute as to whether the plaintiff owed wages to the employees to begin with. Consequently, as a matter of law, the plaintiff could not have "willfully and without good cause" withheld wages; unlike the employer in *Chisholm*, it had a bona fide belief that no commissions were owed. Although the issue of liability for wages was ultimately resolved in the employees' favor, that result is not dispositive regarding whether the plaintiff had a good faith belief that no wages were owed.

■ Finally, the fact that the plaintiff subsequently paid commissions to other employees that it had fired does not support the conclusion that it willfully withheld wages in the instant case. The plaintiff made a business decision, based upon the advice of counsel, to pay wages to employees that it had fired in an effort to protect against wrongful termination claims. That decision is wholly inapplicable to the instant case in which the employees voluntarily quit the employ of the plaintiff, and suggests nothing about the plaintiff's bona fide belief that wages were owed, especially given the ambiguity in the Letter.

Having concluded that the court erred as a matter of law, we decline the employees' invitation to adopt the holding of *Potvin v. Wright's Sound Gallery*, which turns on a factual finding that an employer lacked good

faith for failing to pay wages to employees. *Potvin v. Wright's Sound Gallery, Inc.*, 568 So. 2d 623, 627-28 (La. Ct. App. 1990).

*Affirmed in part; reversed in part; and remanded.*

BRODERICK, C.J., and NADEAU, DALIANIS and DUGGAN, JJ., concurred.