# United States Court of Appeals
## For the First Circuit

No. 15-2245

JAMES WALSH,

Plaintiff, Appellee,

v.

ZURICH AMERICAN INSURANCE COMPANY, d/b/a ZURICH DIRECT MARKETS,
d/b/a ZURICH NORTH AMERICA COMMERCIAL,
d/b/a ZURICH NORTH AMERICA, et al.,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Lipez, Circuit Judges.

Charles P. Roberts, III, with whom Donald S. Prophete and
Constangy, Brooks, Smith & Prophete LLP were on brief, for
appellants.
Jamie N. Hage, with whom Douglas J. Miller, Kathleen A.
Davidson, and Hage Hodes, P.A. were on brief, for appellee.

February 22 2017

**LIPEZ**, **Circuit Judge**.  A jury found that appellant Zurich American Insurance Company ("Zurich") breached employment agreements with appellee James Walsh when it substantially reduced his incentive pay for a lucrative deal -- the largest of its type in the company's history -- and did not pay incentive on another deal.[1]  Walsh was awarded double damages and attorney's fees, totaling nearly $2.4 million, based on findings that Zurich willfully and without good cause withheld the compensation owed. On appeal, Zurich asserts that the evidence failed to show contractual breaches, let alone willful ones.  Hence, the company argues, the district court erred in denying its motion for judgment as a matter of law on Walsh's contract and wage claims.  Zurich alternatively argues that the district court committed legal error by instructing the jury to disregard contract provisions that gave the company discretion to limit incentive pay.

Having carefully reviewed the record and pertinent caselaw, we reject Zurich's contention that it was entitled to judgment as a matter of law on the breach-of-contract and wage claims.  We also uphold the jury's breach and willfulness findings stemming from Zurich's withholding of incentive compensation for a deal made with Great American Insurance Company ("GAIC"). However, we agree that the district court erroneously concluded

---

[1] We note that defendants are a group of related corporate entities whom we refer to collectively as "Zurich."

that, if Walsh had an enforceable incentive plan when the unprecedented deal was struck with Automobile Protection Corp. ("APCO"), Zurich lacked discretion as a matter of law to change Walsh's incentive formula for that deal. Rather than telling the jury to disregard the contractual discretion provisions applicable to that deal, the court should have instructed the jury to determine whether Zurich's exercise of discretion satisfied the implied contractual obligation of good faith and fair dealing.

We therefore vacate the district court's judgment insofar as it incorporates the jury's verdict on the APCO deal, affirm the judgment with respect to the GAIC deal, and remand for further proceedings.

**I.**

**A. Factual Background**

Walsh's dispute with Zurich centers on two compensation plans that awarded him incentive pay based on certain types of new business brought into the company. We sketch the facts as the jury could have found them, drawing all reasonable inferences in the plaintiff's favor. See, e.g., Butynski v. Springfield Terminal Ry. Co., 592 F.3d 272, 274 (1st Cir. 2010).

Walsh was hired by Zurich in 1996 as a finance and insurance ("F&I") regional administrator responsible for sales in Maine and New Hampshire, and he was promoted in 1999 to regional sales manager. Walsh focused on selling various types of coverage

to car dealers, including vehicle service contracts, credit insurance, and tire and wheel coverage. In early 2007, Walsh approached his superiors, Bill Stoothoff and Dennis Kane, seeking increased responsibility and the potential for salary growth within the company. Told that nothing was currently available, Walsh looked elsewhere. He received an offer from GMAC in Chicago that included a guaranteed salary of $350,000 over eighteen months, a $20,000 signing bonus, and a relocation package.

Within an hour after giving Zurich notice of his decision to leave the company, Walsh received a phone call from Kane, Zurich's vice president of direct markets, who asked him to consider staying in a new, soon-to-be-created position. In subsequent discussions, Stoothoff, Zurich's vice president of F&I, offered Walsh the opportunity to manage a new market for Zurich, the "alternative distribution channel" -- ADC -- in which the company, instead of selling service contracts and other auto-related insurance only through car dealers, would sell their products more broadly, e.g., selling service contracts through telemarketing and credit unions, equipment coverage to the original manufacturers, and contractual liability policies to third party administrators of service contracts.

Walsh advised Stoothoff of his three requirements for staying at Zurich: (1) a job description that would allow him to grow, with unlimited potential, (2) an annual salary of $250,000

- 4 -

for the next eighteen months, and (3) "an incentive plan that allows me to make money and grow and do what I need to do." Zurich agreed to meet those terms. In October 2007, Walsh, Stoothoff and Kane signed a "Supplemental Pay Agreement" providing Walsh with a monthly supplement of $13,246.63, payable through March 2009, in addition to his $91,000 base salary -- a total of roughly $250,000 annually. The supplemental payments, which were "in lieu of any incentives earned," were designed to meet Walsh's salary demand until the new business he was expected to generate would produce incentive pay sufficient to support a comparable, or higher, salary.

The October 2007 agreement did not specify the incentive arrangement that would go into effect in April 2009, and the company began discussing the details of Walsh's incentive plan the following summer. By mid-August 2008, Walsh, Stoothoff and Kane had settled on a target of $8 million for the new ADC business in 2009, and they discussed an incentive formula that would result in a total 2009 salary of about $250,000 at the midpoint, with a low of $183,000 and a high of $292,000.[2] By that time, Walsh's base salary had increased to $135,000, and his supplemental payments

_____

[2] The written model prepared by the company's compensation specialists showed Walsh's projected incentive pay for the multiple types of business for which he was responsible ranging from a low-end total of about $48,000 to a maximum of about $157,000. The targeted mid-point amount was $115,000, of which $60,000 was attributed to the ADC.

had decreased ($9,583.35 monthly), with his total annual salary still set to be roughly $250,000 until the start of the incentive plan in April 2009.

Through a series of meetings and emails, Walsh, Stoothoff, Kane, and Diane Eldridge, a Zurich compensation consultant, reached consensus on the plan described above, including a revision requested by Walsh in the description of the ADC incentive. Following a meeting on August 27, 2008, Walsh was "satisfied that my plan was done. . . . As far as I'm concerned, my boss [Stoothoff] and his boss [Kane] told me that this is your plan." Although Walsh acknowledged that he never saw anything in writing confirming that the plan was "final," and the August 2008 plan was never entered into Zurich's finance system, Walsh viewed the "backroom HR or accounting" procedures as irrelevant to the plan's completion. Stoothoff, who had been asked to complete Walsh's incentive plan before he left Zurich at the end of August 2008, also believed that he had accomplished that task.

The plan on its face covered the entire 2009 calendar year, but it was superseded through March by the Supplemental Pay Agreement that had been executed in October 2007. Hence, Walsh would first be eligible to receive incentive payments under the August 2008 Plan for premiums received by Zurich after April 1, 2009. In addition to a chart that specified variable percentages for Walsh's ADC incentive "based on year to date performance

against prorated production and profitability goals,"[3] the August 2008 Plan contained the following "CONDITIONS":

> 1. The PLAN is effective January 1, 2009. INCENTIVE under the PLAN shall be solely within the discretion of the Executive Vice President of the COMPANY and is subject to interpretation by him / her. The PLAN is subject to cancellation by the Executive Vice President at any time.
>
> . . . .
>
> 7. Management of the COMPANY reserves the right to limit INCENTIVE in unique situations.[4]

Walsh testified that these provisions giving Zurich -- and specifically, Kane, the executive vice president -- the discretion to cancel or limit his incentive pay, "didn't mean anything to [him]," because such provisions had "never been enforced."

In September 2008, Walsh contacted representatives of APCO to discuss selling Zurich's new alternative distribution

---

[3] The Plan stated that ADC incentive would be paid on "NET DEALER REMIT (net of chargebacks) for reinsurance and retro accounts sold through ALTERNATE DISTRIBUTION CHANNELS." The chart was in the form of a nine-box matrix with different percentages listed at each intersection of profitability and production goals.

[4] A third reference to discretion appeared under the heading "PURPOSE OF THE PLAN":

> The purpose of the INCENTIVE PLAN is to establish a formula whereby certain employees . . . may, at the sole discretion of the President, be paid an INCENTIVE PAYMENT for the PLAN YEAR as a reward to encourage them to help make the business of the COMPANY a success.

products.  The discussions proved fruitful and, in December 2008, Walsh closed a deal with APCO likely to produce an amount of premiums in 2009 that far surpassed even the high-end projection in the compensation models Zurich had prepared for Walsh. Immediately after the contract signing in a Georgia hotel, as they rode an elevator together, Kane told Walsh that he would make a lot of money on the deal.  Under the 2008 Plan, Walsh would have been entitled to ADC incentive pay of nearly $870,000 in 2009. That plan, however, was not implemented.  Rather, in January 2009, Kane informed Walsh that he would not allow this amount of ADC incentive, and that a new incentive arrangement needed to be developed.

Walsh initially protested any change, telling Kane that he was shocked by the refusal to adhere to the incentive program they had worked out in August 2008.  Within a few days, however, concluding that he had no choice but to accept a change or leave the company, Walsh acquiesced to Kane's request that he recommend an alternative plan that Walsh would consider fair.  Walsh's subsequent proposal provided for a base salary of $250,000 for the duration of the APCO relationship, plus incentives, but Kane responded by email that the salary amount "won't work" because "no one is on a 250k salary" other than the company's top executive. They scheduled a phone conference for later in the week.

Walsh testified that he started that call, on January 30, by again expressing his dissatisfaction with the change in his compensation package, but Kane nonetheless "immediately rolled into, this is how we're going to pay you going forward." Kane then told Walsh that his compensation for 2009 would consist of a continued guarantee of $250,000 in annual income (as Walsh had been promised in October 2007), accomplished through base salary and an extension of the supplemental pay agreement that was due to expire in April 2009. In addition, the new incentive plan -- the "February 2009 Plan" -- would entitle Walsh to $1,000 for each $1 million of ADC premium paid monthly. On February 19, Eldridge reported to Walsh that Kane had formally approved that plan, with minor revisions as Walsh and Eldridge had discussed, and that she would be uploading it into Zurich's compensation database.

Pursuant to the February 2009 Plan, Walsh's ADC incentive in 2009 for the APCO deal -- $77,000 -- was less than one-tenth of the incentive he would have earned under the August 2008 Plan. Nonetheless, his total compensation for 2009 reached $398,000, which consisted of base salary, supplemental payments, and incentives.

Although the February 2009 Plan technically covered only calendar year 2009, no new plan was put into effect for 2010, and Walsh continued to operate under the February 2009 Plan. In the late summer and early fall of 2010, another dispute about incentive

pay arose when Zurich refused to pay Walsh $101,000 based on new business with GAIC. Although the GAIC transaction was booked by Zurich's accounting department as ADC income -- for which Walsh would be entitled to incentive pay -- the company maintained that the deal was unique and did not in fact fit within the ADC category. Accordingly, in mid-October 2010, Zurich executives moved to amend Walsh's still-operative February 2009 Plan to eliminate his entitlement to the $101,000 incentive.

By that time, the relationship between Walsh and Zurich had deteriorated even further. Kane had left Zurich in early 2010, and Walsh's new boss, Tina Mallie, told him in June 2010 that his future travel to meet with customers was being restricted. In conversations with Mallie in September, and with another new boss, Kathi Ingham, in October, Walsh learned that he would no longer be responsible for reinsurance business, which had provided a substantial portion of his incentive pay. On October 29, he sent Ingham an email advising that he would be leaving Zurich in thirty days. He was terminated later that day.

## B. Procedural Background

In January 2012, Walsh filed a complaint against Zurich in New Hampshire state court. Seeking more than $14 million in damages, he alleged breach of contract, breach of the implied covenant of good faith and fair dealing, wrongful discharge, and willful violation of New Hampshire's wage and hour law. He claimed

that Zurich owed him additional APCO incentive, as promised in the August 2008 Plan, and GAIC incentive as provided by the February 2009 Plan.  The case was removed to federal court based on diversity jurisdiction, and a trial took place before a jury.

During the trial, the court granted Zurich's motion for judgment as a matter of law on the wrongful discharge claim,[5] but it otherwise denied the company's motions for judgment as a matter of law both at the close of plaintiff's case and at the close of all evidence.  The court rejected Zurich's contention that Walsh did not produce sufficient evidence to establish that the August 2008 Plan was a binding agreement or that he was entitled to incentive on the GAIC deal.  The court also decided not to instruct the jury on the implied covenant claim, concluding that the contractual good faith issue was subsumed within the breach claim. Specifically with respect to the APCO deal, the court ruled that, if the jury found that the August 2008 Plan was not an enforceable contract, there would be no basis for a claim that the company had breached an implied contractual covenant.  Conversely, the court held, if the jury found that the August 2008 Plan was a binding agreement, Zurich could not have had a good faith belief that the

_____

[5] Walsh has not appealed the court's ruling on the wrongful discharge claim, and we do not further address it.

- 11 -

Plan's discretion provisions permitted it to retroactively modify Walsh's compensation for the APCO deal via the February 2009 Plan.

The jury found in favor of Walsh on the claims for breach of contract and willful violation of New Hampshire wage law, the latter finding providing the basis for doubling the contractual damages. See N.H. Rev. Stat. Ann. § 275:44(IV).[6] The court subsequently denied Zurich's post-trial motion for judgment as a matter of law on those claims, and it granted Walsh's motion for attorney's fees and expenses. The monetary awards, before doubling, were $791,353 on the APCO deal and $101,000 on the GAIC

---

[6] Section 275:44 is titled "Employees Separated From Payroll Before Pay Days," and it generally provides for the prompt payment of wages owed. At issue here is subsection (IV), which states, in pertinent part:

> If an employer willfully and without good cause fails to pay an employee wages as required under . . . this section, such employer shall be additionally liable to the employee for liquidated damages in the amount of 10 percent of the unpaid wages for each day except Sunday and legal holidays upon which such failure continues after the day upon which payment is required or in an amount equal to the unpaid wages, whichever is smaller . . . .

N.H. Rev. Stat. Ann. § 275:44(IV). The New Hampshire Supreme Court deems an employer's failure to pay owed compensation "willful and without good cause" when the nonpayment is done "voluntarily, with knowledge that the wages are owed and despite financial ability to pay them." Ives v. Manchester Subaru, Inc., 498 A.2d 297, 302 (N.H. 1985) (Souter, J.).

deal. The parties stipulated to an award of $595,000 in attorney's fees and $9,171.52 in other legal expenses.

This appeal followed.

## II.

On appeal, Zurich argues that the district court incorrectly concluded that sufficient evidence supported the jury's breach-of-contract and willfulness findings on the APCO and GAIC deals and, hence, the court erred by denying its motions for judgment as a matter of law on every claim submitted to the jury. On the question of breach, Zurich argues that Walsh failed to prove two facts necessary to find the company liable for the disputed incentive amounts: (1) the August 2008 Plan was an enforceable contract covering the APCO deal, and (2) the GAIC deal involved ADC business covered by the February 2009 incentive plan. In addition, Zurich maintains that the court made a legal error in handling the APCO breach claim when it refused to instruct on the covenant of good faith and fair dealing or "to submit any issue regarding Zurich's right under the August 2008 Plan to modify the plan and/or limit incentive before the plan became effective on April 1, 2009."

Zurich further claims that the evidence failed to establish that the company acted willfully and without good cause when it paid Walsh incentive for the APCO deal under the February 2009 Plan, rather than the August 2008 Plan, and in refusing to

pay incentive on the GAIC deal.  As may be appropriate based on the outcome of its claims on the merits, the company also seeks reversal of the attorney's fee award or remand for reconsideration of the fee amount.

We review de novo the district court's denial of Zurich's motions for judgment as a matter of law, "viewing the evidence in the light most favorable to the nonmoving party."  T G Plastics Trading Co. v. Toray Plastics (Am.), Inc., 775 F.3d 31, 37 (1st Cir. 2014) (quoting Monteagudo v. Asociación de Empleados del Estado Libre Asociado de P.R., 554 F.3d 164, 170 (1st Cir. 2009)). We also apply de novo review to the asserted instructional error. See Burke v. McDonald, 572 F.3d 51, 57 (1st Cir. 2009) ("Where, as here, a claim of instructional error challenges the very basis for instructing or refusing to instruct on a particular subject, we review that claim of error de novo.").

**A. The August 2008 Plan**

**1. Sufficiency of the Evidence**

In the circumstances of this case, whether the August 2008 Plan was an enforceable contract is a question of fact, see, e.g., Durgin v. Pillsbury Lake Water Dist., 903 A.2d 1003, 1006 (N.H. 2006), and we may overturn the jury's finding that it was a finalized agreement only if we can say that no reasonable jury could have reached that conclusion, see, e.g., T G Plastics Trading

- 14 -

Co., 775 F.3d at 38.  Zurich is unable to satisfy this "stringent standard."  Id.

Three witnesses testified that they understood the contract was effectively a done deal by the time Stoothoff left Zurich at the end of August.  Walsh reported that the discussions among him, Stoothoff, Kane, and Eldridge through the summer of 2008 culminated with a meeting in Eldridge's office on August 27 for the purpose of "finaliz[ing] this plan."  Walsh testified that, during that meeting, Stoothoff "called in . . . and gave his blessing," and Walsh left Eldridge's office "satisfied that my plan was done."  Stoothoff similarly testified that he believed "all of the essential terms [had] been agreed to," and he therefore "thought we were done" and "assumed [the plan] was final" when he left Zurich.  He agreed that a reasonable person in Walsh's shoes would "have reasonably believed that he would be paid on that incentive plan for 2009."  Stoothoff also testified that Kane had approved the plan as it stood on August 27.

To be sure, other evidence suggested that the August 2008 Plan was never finalized, at least in the way incentive plans ordinarily were implemented at Zurich.  Eldridge testified that she never received a formal sign-off from Kane on the August 2008 Plan, noting that "[t]he only approval I received from him was in February of '09."  Hence, she never submitted the August 2008 Plan for inclusion in Zurich's compensation database.  Even Walsh

- 15 -

testified that he did not know what steps needed to be taken to implement his plan once it had been agreed upon. He acknowledged that "finalized to me and finalized to the managers above me may mean two different things," and he recognized that Stoothoff "may have [had] other things to do to get it through and get through the system." Indeed, Stoothoff testified that he did not remember Kane saying the plan was final, but he "assumed it was [based] on the way the interactions were going."

The record thus presents mixed messages about the status of the August 2008 Plan, and that conflict was for the jurors to resolve. It is not our role to second-guess their determination that a meeting of the minds -- and, hence, a binding agreement -- was reached when the discussion of terms ended on August 27, with everyone's apparent approval. See Chisholm v. Ultima Nashua Indus. Corp., 834 A.2d 221, 225 (N.H. 2003) ("A meeting of the minds is present when the parties assent to the same terms."); see also Durgin, 903 A.2d at 1006 ("A valid, enforceable contract requires offer, acceptance, consideration, and a meeting of the minds."). The missing formal steps -- including entry into Zurich's compensation database -- could be attributed to the fact that implementation of the Plan was more than seven months away rather than to its non-final status.[7]

_____

[7] Zurich also highlights the absence of any written protest by Walsh about the subsequent change in incentive as an indication

- 16 -

Accordingly, we reject Zurich's contention that the record does not support the jury's finding that the August 2008 Plan was an enforceable contract.

### 2. Breach of Contract Instructions

#### a. Background

Throughout the trial, Zurich's counsel argued that, even if the August 2008 Plan was a binding agreement, the company was free to reduce Walsh's incentive for the APCO deal pursuant to the language giving management discretion on whether to pay incentive and, specifically, to "limit INCENTIVE in unique situations." The district court ultimately decided that New Hampshire law barred Zurich from relying on the Plan's discretion provisions, and, over Zurich's objection, it instructed the jury on that point as follows:

> Now, you have heard some evidence in this case suggesting that the August 2008 incentive plan contained language reserving discretion to Zurich to change the incentive rates with respect to the APCO deal as it deemed appropriate. That reservation of rights does not permit Zurich to change incentive pay rates for the APCO deal after it was closed. If you find that the August 2008 incentive plan is a binding contract, Zurich is

_____

that he understood the August 2008 Plan was not final under "the established procedure at Zurich for approving and finalizing pay plans." That inference is countered, however, by Walsh's testimony that he felt compelled either to accept the new plan "or walk out the door and try to find another job" -- with the latter choice not feasible at that time.

- 17 -

obligated to pay plaintiff in accordance with its terms with respect to the APCO deal.

In rejecting Zurich's reliance on the discretion provisions, the district court took the view that Walsh's incentive pay from the APCO deal, though not labeled as such, was akin to a commission that, under New Hampshire case law, necessarily vested in December 2008 and could not be withheld absent extenuating circumstances, such as a financial disaster for the company.[8] See, e.g., New Eng. Homes, Inc. v. R.J. Guarnaccia Irrevocable Tr., 846 A.2d 502, 504 (N.H. 2004) (stating the general rule that "a person employed on a commission basis to solicit sales orders is entitled to his commission when the order is accepted by his employer"

---

[8] In its oral ruling on Zurich's renewed motion for judgment as a matter of law following the presentation of all evidence, the court stated, inter alia, the following:

> So New Hampshire common law is pretty clear, it seems to me. You cannot retroactively divest an employee of a deferred compensation amount that he's already earned under an agreement that was extant. And if that weren't enough, New Hampshire statutory law and regulatory law is pretty clear. . . . Certainly Zurich could change the terms of employment with respect to incentive pay, but only prospectively, not retroactively. . . .
>
> So to the extent that language purports to vest Zurich with discretion to retroactively change a vested deferred compensation entitlement, it's contrary to statutory law, and therefore is ultra vires and against public policy and totally unenforceable.

(quoting Galloway v. Chicago-Soft, Ltd., 713 A.2d 982, 984 (N.H. 1998))); see also Gilman v. Cheshire Cty., 493 A.2d 485, 488 (N.H. 1985) (holding that an employer may not "impair its obligation to pay [certain] benefits by changing its . . . policy after the compensation was earned"). The court also construed regulatory and statutory provisions to allow "only prospective[]" changes to Walsh's incentive pay. See N.H. Code Admin. R. Lab. 803.03(c) (requiring employers to provide written notice of a change in an employee's rate of pay or salary "prior to the effective date of such change"); see also N.H. Rev. Stat. Ann. § 275:49(II) (requiring notice of changes in rates of pay "prior to the time of such changes").

In addition, the court observed that Zurich's promise to pay Walsh at a specific rate was designed to incentivize him to sell ADC products. Once he did so, the court ruled, the company had no discretion to change the incentive formula solely to "[m]ake Zurich richer [and] [m]ake the plaintiff poorer." The court thus held that any exercise of discretion to retroactively deny Walsh "a vested deferred compensation entitlement" was "against public policy and totally unenforceable." See supra note 8. Accordingly, it refused to instruct the jury on the covenant of good faith and fair dealing "because I'm not going to allow the defense of we have discretion to not pay him."

On appeal, Zurich reiterates its contention that the August 2008 Plan and New Hampshire law allowed the company to change Walsh's incentive formula, limited only by the obligation to do so reasonably and in good faith. The company asserts that the record unequivocally demonstrates that it complied with this obligation, and, hence, it is entitled to judgment as a matter of law on the breach of contract claim. At a minimum, the company argues, the jurors should have been instructed on the implied covenant of good faith and told that, if they found the August 2008 Plan to be a binding agreement, they must go on to determine whether Zurich's substitution of a new plan in February 2009 was a reasonable and good-faith exercise of the discretion explicitly given to company management by the Plan. As we explain below, we agree that Zurich was entitled to such an instruction.

### b. Interpreting the Plan

The district court reached its conclusion that Walsh's incentive for the APCO deal vested in December 2008, barring its retroactive reduction, by "reading [the August 2008 Plan] in context and properly construing it." The court's focus on the terms of the agreement is consistent with both employment law generally and New Hampshire's approach to employment contract disputes. See Restatement of Employment Law § 3.02(b) ("Whether incentive compensation has been earned is determined by the agreement on incentive compensation between the employer and

employee or any binding employer promise or binding policy statement.");[9] New Eng. Homes, 846 A.2d at 508 (finding that ambiguity in a Letter of Understanding setting forth commission structure created "a legitimate dispute as to whether the plaintiff owed wages to the employees"); Galloway, 713 A.2d at 985 (examining employment agreement to determine whether contract specified departure from general rule that "employees paid on a commission basis earn commissions when their employer accepts an order"); see also Pachter v. Bernard Hodes Grp., Inc., 891 N.E.2d 279, 285 (N.Y. 2008) ("[W]hen a commission is 'earned' and becomes a 'wage' for purposes of [the New York wage-payment statute] is regulated by the parties' express or implied agreement . . . .").

However, the district court did not identify which specific terms of the August 2008 Plan it relied on, and our own

_____

[9] Section 301 of the Restatement of Employment Law, titled "Right to Earned Compensation," includes the following comment:

> Earned compensation. The employer's obligation to pay compensation depends on whether the employee has earned it. In the case of a salary or wage, the employee is typically paid for a period of service, and the compensation is earned when that period ends . . . . In the case of commissions, the employee is paid for sales made or other unit of output produced, and whether the compensation is earned depends on whether the sales have been made or other unit of output has been produced in accordance with the parties' agreement.

Id. § 3.01, cmt. d.

review of the Plan's language leads us to a contrary view. See Clukey v. Town of Camden, 797 F.3d 97, 101 (1st Cir. 2015) (stating that a trial court's contract interpretation is reviewed de novo); Birch Broad., Inc. v. Capitol Broad. Corp., 13 A.3d 224, 228 (N.H. 2010) (same). Before detailing our reasoning, we note that we agree with the underlying premise of the district court's ruling -- i.e., if the August 2008 Plan gave Walsh "a vested deferred compensation entitlement," equivalent to an ordinary commission, for his work on the APCO deal, Zurich could not reduce that entitlement retroactively. Hence, the first inquiry is whether, under the August 2008 Plan, the incentive promised to Walsh for the APCO business vested when he closed the deal in December 2008.

In interpreting the Plan, we "give the language used by the parties its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole." Birch Broad., 13 A.3d at 228. When we conduct that examination, we find multiple indicators that Walsh did not "earn" incentive when the APCO deal closed in December 2008; rather, his entitlement to incentive pay vested when Zurich received ADC premiums and could apply the variables specified in the August 2008 Plan to determine the amount of incentive due.

First, as the district court recognized, the August 2008 Plan does not set forth a classic commission arrangement, whereby the employee is entitled to a certain percentage of the amount of

a sale of goods or real estate.[10]  See, e.g., New Eng. Homes, 846 A.2d at 504 (specifying three and one-half percent "commission" for modular home sales); Galloway, 713 A.2d at 984-85 (specifying "commission rate[s]" "to be paid on sales closed").  Although commission in the insurance industry would more likely be based on premiums received than on "products" (i.e., policies) sold, and the Plan establishes a premium-based measure, the agreement does not say that Walsh "earns" a specified percentage of the premiums resulting from the sale of ADC insurance products.  Rather, the Plan's self-proclaimed purpose is to set up a "formula whereby certain employees . . . may, at the sole discretion of the President, be paid an INCENTIVE PAYMENT for the PLAN YEAR as a reward to encourage them to help make the business of the COMPANY a success."  The "Purpose" paragraph goes on to say that "[t]he amount of INCENTIVE to each PARTICIPANT is related to VEHICLE SERVICE CONTRACT new business & service."  (Emphasis added.)

Specifically with respect to ADC incentive, the Plan states:

> ALTERNATIVE DISTRIBUTION CHANNEL incentive shall be paid on Net Dealer, Third Party Administrator, Agency Business and Original Equipment Manufacture Remit (net of

---

[10] Early in the trial, the court observed that the promised incentive "looks like commission, but neither side is claiming it's a commission," and it noted at another point that Walsh "didn't have a deal per commission when he made the sale."  The court properly looked beyond the terminology in attempting to discern the nature of the incentive.

chargebacks) sold through ALTERNATIVE DISTRIBUTION CHANNELS. . . . Quarterly INCENTIVE shall be calculated on year to date performance against prorated production and profitability goals . . . [and] when calculation results in a negative amount, no INCENTIVE shall be paid in that quarter.

The amount of incentive pay, which is described generally as "related to" new ADC business, thus depends specifically on developments occurring after the deal -- "year to date" factors that, as Walsh explained at trial, include the "loss ratio" for the new products. Indeed, the Plan contemplates the possibility that no incentive will be paid in some fiscal quarters.

In other words, the incentive arrangement in the August 2008 Plan is framed as a computation based on the company's net income from certain new business, not as a calculable entitlement triggered by sales consummated by Walsh. In fact, in its ruling on Zurich's post-trial motion for judgment as a matter of law on the GAIC deal, the district court noted the parties' concession "that Walsh did not have to personally sell anything in order to receive incentive pay on this, or any other, deal producing Alternative Distribution Channel revenue; he was compensated based on premiums realized through the ADC." Order at 24 n.1. The acknowledged reliance on premiums collected to determine incentive, rather than on Walsh's own efforts, underscores the distinction between the Plan and a typical commission arrangement. That is, the incentive promise here was premised on the receipt of

premiums, starting in April 2009, and not on the acquisition of the new business that would produce those premiums.

Second, the Plan by its terms went into effect on January 1, 2009, and Walsh's incentive payments were not scheduled to begin until April. There is no dispute that, at least until the first of the year, the only operative agreement governing Walsh's compensation above his base salary was the October 2007 Supplemental Pay Agreement. Thus, when the August 2008 Plan was adopted (according to the jury), it provided a promise of future payment, not an immediate entitlement. The district court noted this prospective effect, observing that, as of December 2008, the pertinent "employment period hasn't commenced." Walsh's testimony reinforces the future focus of the August 2008 Plan. In describing how the ADC incentive program was set up, Walsh noted that he and his superiors expected premiums to come in on a monthly basis, "[s]o at the end of my supplemental pay on April 1st of 2009, I would need to have premiums coming in the door in order for me to earn income." (Emphasis added.) At another point, he similarly stated that his incentive was based on "the actual premium that came in the door."

Third, the Plan states that departing employees are entitled to "INCENTIVE earned prior to termination," and specifies that the incentive due "shall be calculated based on production and profitability at the time of termination and paid at the next

- 25 -

regular INCENTIVE pay date." Once again, the focus is on performance factors that can only be established when premiums start to be paid. Under this provision, if Walsh had left Zurich in February or March of 2009, he would not be entitled to an incentive payment because his compensation package did not incorporate the incentive formula until April 2009. Hence, this provision seems at odds with a determination that he had "earned" incentive as soon as he closed the deal.

Taken together, the Plan's express language and its context -- notably, that it did not govern Walsh's compensation until April 2009 -- persuade us that the legally correct reading of the August 2008 Plan does not give Walsh vested incentive pay at the time he closes a deal. Rather, when the Plan took effect on January 1, Walsh acquired a contractual right to receive ADC incentive pursuant to the Plan's formula -- a right that, as explained below, constrained Zurich's discretion to alter the formula -- but he had not yet earned any incentive. Walsh's testimony is compatible with this reading, and the interpretation gains further strength from the Plan's multiple references to the company's discretion to withhold or change the incentive pay specified therein. Walsh was told in express terms that, notwithstanding the formula in the Plan, the incentive pay he will receive in the future may be limited by management in "unique situations." In other words, he was warned that his incentive pay

may differ from the Plan's terms.  He accepted the Plan with that warning.  See Olbres v. Hampton Coop. Bank, 698 A.2d 1239, 1243 (N.H. 1997) ("[P]arties generally are bound by the terms of an agreement freely and openly entered into, and courts cannot make better agreements than the parties themselves have entered into or rewrite contracts merely because they might operate harshly or inequitably."  (quoting Mills v. Nashua Fed. Sav. & Loan Assoc., 433 A.2d 1312, 1315 (N.H. 1981) (alteration in original)).

Of course, as we explain in the next section, this interpretation of the Plan does not mean that Zurich possessed unbridled authority to revise the incentive formula for 2009 to Walsh's detriment.  Rather, it means only that the February 2009 Plan did not effect a retroactive diminution of earned compensation that would be barred as a matter of law.[11]  The question remains whether the particular adjustment that Zurich made, even though facially permissible under the discretion provisions of the August 2008 Plan, nonetheless constituted a breach of contract.

---

[11] Under this construction of the August 2008 Plan, the district court's reliance on New Hampshire provisions requiring notice of changes in compensation "prior to the time of such changes" was also misplaced.  N.H. Rev. Stat. Ann. § 275:49(II); see also N.H. Code Admin. R. Lab. 803.03(c).  Walsh had notice of the February 2009 Plan before the change in his incentive pay took effect in April.

## c. The Obligation of Good Faith

Under New Hampshire law, a contract giving one party unlimited discretion to modify the agreement is permissible, but subject to "an implied obligation of good faith to observe reasonable limits in exercising that discretion, <u>consistent with the parties' purpose or purposes in contracting</u>." <u>Centronics Corp. v. Genicom Corp.</u>, 562 A.2d 187, 193 (N.H. 1989) (Souter, J.) (emphasis added). Hence, when discretionary action adverse to the complaining party is taken, the question is whether "the defendant's exercise of discretion exceeded the limits of reasonableness." <u>Id.</u>

> The answer to this question depends on identifying the common purpose or purposes of the contract, against which the reasonableness of the complaining party's expectations may be measured, and in furtherance of which community standards of honesty, decency and reasonableness can be applied.

<u>Id.</u> at 193-94; <u>see</u> <u>also</u> <u>Milford-Bennington R.R. Co.</u> v. <u>Pan Am Rys., Inc.</u>, 695 F.3d 175, 179-80 (1st Cir. 2012) (describing New Hampshire law); <u>Livingston</u> v. <u>18 Mile Point Dr., Ltd.</u>, 972 A.2d 1001, 1005-06 (N.H. 2009) (stating that the function of the implied good-faith duty, in the context of "limitation of discretion in contractual performance," is "to prohibit behavior inconsistent with the parties' agreed-upon common purpose and justified expectations, as well as 'with common standards of decency,

fairness and reasonableness'" (quoting <u>Richard</u> v. <u>Good Luck</u> <u>Trailer Court</u>, 943 A.2d 804, 808 (N.H. 2008)) (citation omitted)).

As described above, the district court refused to allow the jury to consider the reasonableness of Zurich's substitution of the February 2009 Plan for the August 2008 Plan with respect to the APCO incentive. Instead, the court resolved that issue as a matter of law, incorrectly ruling that Zurich had acted unreasonably because, in its view, the company impermissibly withheld an amount of incentive that Walsh had already earned.

Zurich asks us for the converse ruling: a determination as a matter of law that it acted reasonably and in good faith. The company asserts that the reduction in Walsh's incentive was reasonable, and thus proper, because it was driven by the enormous, unanticipated value of the APCO deal. As noted above, Walsh would have been entitled to nearly $870,000 in APCO incentive alone in 2009 under the August 2008 Plan -- giving him total compensation for the year of about $1.1 million. That salary far exceeds the annual income discussed in 2007 when Walsh was persuaded to stay at Zurich, and it also eclipses by a large margin the high-end salary predicted for 2009 by the modeling for the August 2008 Plan ($292,000). More pertinently, Walsh's claimed incentive amount dwarfs the incentive modeling for the first year of ADC business, which predicted a high point of $90,000. Hence, Zurich argues, the roughly $400,000 income that resulted from the February 2009

incentive arrangement -- combined with the company's decision to extend Walsh's guaranteed monthly supplemental payments[12] -- was patently reasonable and consistent with the parties' "common purpose or purposes."  Centronics Corp., 562 A.2d at 194; see also id. ("[T]he good faith requirement is not a fail-safe device barring a defendant from the fruits of every plaintiff's bad bargain, or empowering courts to rewrite an agreement even when a defendant's discretion is consistent with the agreement's legally contractual character.").

Although Zurich offers a plausible view of the evidence, we cannot say that it is the only permissible view.  A jury could have found that the amount of the reduction in Walsh's anticipated APCO incentive was excessive in light of the parties' intentions when the August 2008 Plan was developed.  Zurich knew that Walsh was hoping for unlimited potential in his new position, and the company's stated goal was to keep Walsh at Zurich.  A jury could thus find that, when they agreed to the August 2008 Plan, the parties' underlying objective was to provide Walsh, as soon as possible, with substantially higher income than the minimum he had

_____

[12] As noted above, the October 2007 Supplemental Pay Agreement ended by its terms in March 2009.  The monthly payments it provided were specifically "in lieu of any incentives earned."  When Zurich switched to the February 2009 Plan for Walsh's incentive pay, it also prepared a new Supplemental Pay Agreement that provided a monthly allotment of $12,777.77 from April to December 2009 "in addition to any incentives earned."

been guaranteed when he agreed to remain at Zurich. Though no one anticipated such a lucrative deal to materialize so early in Zurich's acquisition of ADC business, a jury could view the switch to a much less favorable incentive formula for the APCO business as inconsistent with the wide-open compensation potential the parties had agreed upon. In addition, Walsh's testimony suggested that he acted to his disadvantage based on the terms of the August 2008 Plan because its incentive structure motivated him to take "the chance" of focusing solely on the APCO business, rather than pursuing multiple other deals.

Given that the evidence presented at trial could have supported either of these scenarios, the district court erred by, in effect, directing the jury to find a breach if it found the August 2008 Plan to be a binding, enforceable agreement. Instead, the court should have instructed the jurors that, because the Plan expressly gave Zurich discretion to limit incentive pay, they must go on to determine whether the company reasonably and in good faith exercised that authority -- i.e., whether the particular changes to Walsh's compensation package in February 2009 satisfied the implied contractual covenant of good faith. See Centronics Corp., 562 A.2d at 193.

Put another way, Zurich's adoption of a less favorable formula would not in itself be a breach of the contract's explicit terms because the August 2008 Plan on its face allowed Zurich to

make whatever changes it wanted to Walsh's incentive pay. Walsh's APCO-related breach claim thus depended on whether, in making that change, Zurich breached the covenant of good faith and fair dealing implicit in the August 2008 Plan. If the jury were to find no violation of the implied covenant, there would be no contractual breach. Consequently, the portion of the district court's judgment incorporating the finding of breach must be vacated.

### 3. Willfulness

Our decision invalidating the finding of breach with respect to the APCO incentive necessarily also invalidates the jury's finding that Zurich "willfully and without good cause" failed to pay wages owed, in violation of New Hampshire law. N.H. Rev. Stat. Ann. § 275:44(IV); see supra note 6. Zurich argues that it is entitled to judgment as a matter of law on the statutory claim, which provided for doubling the breach-of-contract damages.

New Hampshire courts have construed the phrase "willfully and without good cause" to mean "voluntarily, with knowledge that the wages are owed and despite financial ability to pay them." Chisholm, 834 A.2d at 226 (quoting Ives v. Manchester Subaru, Inc., 498 A.2d 297, 302 (N.H. 1985) (Souter, J.)). Although an employer cannot avoid a willfulness finding simply by disputing an employee's entitlement to pay, see Chisholm, 834 A.2d at 225-26, "no liquidated damages are available when an employer's refusal to pay wages is based upon bona fide belief that he is not

obligated to pay them," New Eng. Homes, 846 A.2d at 507-08 (quoting Richmond v. Hutchinson, 829 A.2d 1075, 1077 (N.H. 2003)).   New Hampshire law contemplates legitimate disputes "over the amount of wages," and employers are directed by statute to pay "without condition" and within specified time periods "all wages, or parts thereof, conceded by [them] to be due, leaving to the employee all remedies he might otherwise be entitled to . . . as to any balance claimed."  N.H. Rev. Stat. Ann. § 275:45(I).

We leave this willfulness issue for resolution on remand.  In a new trial, additional evidence may be offered on the parties' expectations and understandings when they agreed to the August 2008 Plan.  The question of willfulness should be assessed on the basis of any such new record.  However, we take no view as to whether the issue of willfulness should reach the jury.  Hence, as with the issue of breach, we vacate the judgment entered on the statutory wage claim with respect to the APCO incentive.

**B. The GAIC Incentive**

### 1.  Sufficiency of the Evidence

Zurich attempted to persuade the jury that the type of business involved in the GAIC deal was never intended to trigger incentive pay for Walsh, and that the company's decision to amend the February 2009 Plan to exclude that payment was merely an attempt to clarify his compensation.   The record, however, permitted the jury to conclude otherwise.

As with the August 2008 Plan, the evidence was not one-sided, and Zurich offered testimony that could have supported a verdict in its favor. Kathi Igham, the vice president for finance and insurance in the fall of 2010, testified that the disputed GAIC deal was "purely a financial transaction[] that didn't fall under [Walsh's] responsibilities of the sale and service of the alternative distribution channel." She elaborated that the agreement was "just a transfer of liability from Great American to Zurich," and, as such, it was not "appropriate" for Walsh to receive incentive on that deal. In addition, she explained that this type of transaction was not "contemplated within th[e] definition" of ADC, but was placed there "from an accounting perspective" because it was even less suitable for placement on the "direct side" of the business -- i.e., "it ended up to be a good sort of path of least resistance to put it in the alternate channel." Terry McCafferty, a Zurich senior vice president involved in the GAIC deal, likewise described that business as "a very unusual transaction" -- "not something we normally do" -- and stated that "there was really no place else to put it per se that made sense."

Walsh, however, presented evidence permitting the jury to find that the 2009 Plan awarded him incentive on the GAIC deal. Indeed, an email sent on September 8, 2010 from a payroll employee

to Tina Maillie -- Ingham's predecessor as vice president -- explicitly said as much. In pertinent part, the email stated:

> The financial statements for August include $105M in premium on the GAIC reinsurance deal. Based on the 2009 plan, we would pay $105,000 to Jim Walsh on this premium. How would you like to handle the August incentive due to the current review of the 2009 plan and the dollar amount of the incentive payment?[13]

A month later, on October 13, Ingham sent an email to Eldridge containing the following directive: "[A]s we discussed, we should have an amendment that stipulates that Jim [Walsh] will not receive incentive related to the GAIC UPR transaction that posted in September for $101m." McCafferty, despite his statement that the deal was "very unusual," said he could offer no guidance on whether it was -- or was not -- properly categorized as ADC business.

Zurich's contention is that these communications about amending Walsh's incentive plan simply reflect the company's effort to reconcile the language of the plan with the understanding that the GAIC deal was not, in fact, ADC business and, hence, should not be treated as a basis for incentive for Walsh. Given the competing evidence, however, we cannot say that it was

---

[13] It appears that there were two separate GAIC deals that closed at about the same time, totaling $105 million. The parties' dispute concerns only $101 million in GAIC business -- hence, an incentive of $101,000 (at the rate of $1,000 per $1 million under the February 2009 Plan).

unreasonable for the jury to accept Walsh's claim that he was entitled to incentive pay for the $101 million GAIC deal.

## 2. Willfulness

The evidence described above also was sufficient to permit the jury's finding that Zurich acted willfully in refusing to pay Walsh incentive on the disputed GAIC deal. Given the jury finding that the February 2009 Plan covered that deal, the communications above permit the inference that Zurich "voluntarily, with knowledge of the obligation and despite the financial ability to pay it," withheld the $101,000 incentive owed to Walsh. Ives, 498 A.2d at 302.

## III.

To briefly recap our holdings, we find no error in the district court's denial of judgment as a matter of law to Zurich on the APCO breach-of-contract claim. The evidence was sufficient to support the jury's finding that the August 2008 Plan was an enforceable agreement. However, because the district court erroneously instructed the jury that Zurich lacked discretion to change Walsh's incentive pay, and it consequently failed to instruct the jury on the implied covenant of good faith, we vacate the portion of its judgment incorporating the jury's breach-of-contract finding on the APCO incentive and the related violation of statutory wage law (the willfulness issue). Accordingly, we vacate the award on the APCO deal of $1,582,706 (the claimed

- 36 -

incentive of $791,353, doubled by statute).  On the GAIC claim, we affirm the judgment incorporating the jury's findings and, hence, uphold the award on that deal of $202,000 (the claimed incentive of $101,000, doubled).  Given these holdings, and the need for the district court to reconsider its award of attorney's fees, we vacate that award.

Going forward, this case will be in a considerably different posture.  Neither the enforceability of the August 2008 Plan nor the GAIC claims will be retried.  In addition, we have found, as a matter of law, that the August 2008 Plan does not entitle Walsh to incentive payments for the APCO deal pursuant to the formula set forth in that plan.  Hence, the focus will be on whether Zurich's exercise of its reserved discretion to change Walsh's incentive arrangement "exceeded the limits of reasonableness."  Centronics Corp., 562 A.2d at 193.  Relatedly, the issue of willfulness under the New Hampshire wage statute must be revisited.  See N.H. Rev. Stat. Ann. § 275:44(IV).  Given this landscape, we believe both parties would be well advised to consider settlement.

Affirmed in part, vacated in part, and remanded for proceedings consistent with this opinion.  Each party to bear his or its own costs.